[No. 81028-1.   En Banc.]
Argued March 13, 2008.   Decided September 25, 2008.

NANCY ADAMS ET AL., *Appellants*, v. KING COUNTY ET AL., *Respondents*.

642

*Stephen L. Bulzomi* and *Jeremy A. Johnston* (of *Messina Bulzomi Christensen*), for appellants.

*Grant S. Degginger, June K. Campbell,* and *Ryan P. McBride* (of *Lane Powell, PC*), for respondents.

¶1 Owens, J. — This case presents the issue of whether a person who makes an undesignated anatomical gift by signing an organ donor card authorizes only a hospital to accept such a gift. We hold that the former Washington Uniform Anatomical Gift Act (WAGA), RCW 68.50.520-.620 (1993), *repealed by* Laws of 2008, ch. 139, § 31, RCW 68.50-.901-.903, allows only hospitals to accept an undesignated anatomical gift. Furthermore, we hold that while the WAGA does not provide a statutory cause of action, unauthorized use of an organ is actionable under common law theories of recovery.

## STATEMENT OF FACTS

¶2 Jesse Smith unexpectedly died of heart problems shortly after his 21st birthday. Shortly before he died, Jesse had renewed his driver's license and signed an attached card indicating his intent to make an anatomical gift of his organs. The card did not ask him to designate a donee for such a gift. Clerk's Papers (CP) at 268-69.

¶3 Given the suddenness of death, Jesse's body was sent to the King County Medical Examiner for an autopsy. At the time of the autopsy, the medical examiner apparently had not determined if Jesse made an anatomical gift of any kind.

¶4 Pursuant to agreement, the medical examiner shared its autopsy information with the Stanley Medical Research Institute (SMRI), a nonprofit organization located in Maryland and dedicated to supporting research of certain brain disorders. SMRI procures brain tissue for research at various facilities. The agreement between the King County Medical Examiner and SMRI (collectively Respondents)

provided that SMRI would fund a pathologist position in the medical examiner's office in exchange for the procurement of brain tissue from corpses received by the medical examiner. CP at 252-57. Dr. Nabila Haikal held SMRI's funded position at the medical examiner's office at the time Jesse's body arrived for an autopsy.

¶5 On the day that Jesse died, Dr. Haikal called Jesse's mother, Nancy Adams, to ask for permission to take Jesse's brain tissue for research purposes. The parties dispute the nature of this conversation. According to Adams, Dr. Haikal requested a small sample of Jesse's brain tissue for research.[1] Adams did not consent immediately. Dr. Haikal then spoke for several minutes with Adams's husband, Matthew Adams (Jesse's stepfather), during which Dr. Haikal assured him that SMRI did not want to remove Jesse's entire brain. Adams got back on the phone and verbally consented to donate a sample of Jesse's brain to SMRI for the purpose of medical research. Dr. Haikal completed and signed a consent form at the medical examiner's office indicating that Adams had agreed to "the removal of brain tissue" for purposes of SMRI's research support. CP at 234.

¶6 The medical examiner performed the autopsy the next day. During the autopsy, the medical examiner removed Jesse's brain along with his other organs for measurement. All the organs were replaced except for the brain, which was retained in whole and sent to SMRI. SMRI also collected tissue from Jesse's spleen and liver as well as blood and cerebral fluid samples for related research on the brain. The autopsy report stated that "[t]he brain . . . is donated to the Stanley Foundation by the family's permission for neuropathological research." CP at 274. Adams made no inquiry about the autopsy.

¶7 Over a year later, Adams learned through a Seattle television news report about SMRI's procurement activities

---

[1] While Jesse had no diagnosed brain disorder, SMRI apparently procured normal brain tissue for research.

at the medical examiner's office. Through this investigation, Adams learned that SMRI had taken Jesse's entire brain and other body samples. Upon learning of this information, Adams allegedly suffered from grief and depression, requiring psychological and psychiatric treatment.

¶8 Adams filed suit against Respondents in 2006, claiming a violation of the WAGA as well as tortious interference with a dead body, invasion of privacy, conspiracy, and fraud, among other claims.[2] Respondents moved for summary judgment of all claims. Respondents argued that SMRI was authorized to accept Jesse's gift, which foreclosed all liability. The trial court granted Respondents' motion and dismissed the entire case. Adams appealed to the Court of Appeals. The commissioner transferred the case to this court. *See* RAP 4.4.

## ANALYSIS

### I

¶9 This court reviews an order granting summary judgment de novo. *City of Seattle v. Mighty Movers, Inc.*, 152 Wn.2d 343, 348, 96 P.3d 979 (2004). Under CR 56(c), a court may grant summary judgment if the record presents no genuine issue of material fact and the law entitles the moving party to judgment. *Id.* "In conducting this inquiry, this court must view all facts and reasonable inferences in the light most favorable to the nonmoving party." *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004). Such facts must move beyond mere speculative and argumentative assertions. *Retired Pub. Employees Council of Wash. v. Charles*, 148 Wn.2d 602, 612-13, 62 P.3d 470 (2003). The court should grant summary judgment "only if reasonable persons could reach but one conclusion." *Id.* at 613.

---

[2] Matthew Adams agreed to dismissal of all of his claims against Respondents. The parties also agreed to dismiss all claims against Dr. Torrey.

## II

¶10 The issue for review requires us to determine the scope of Jesse's anatomical gift. The parties agree that if the WAGA effectively authorized SMRI to accept Jesse's gift, then Adams has no cause of action against Respondents. Br. of Appellant at 28. Alternatively, if Respondents violated the WAGA, then we must consider Adams's theories of liability.[3]

### A

¶11 The WAGA authorizes a qualifying donee to accept an anatomical gift for certain purposes. The donor can make such a gift simply by signing an organ donor card attached to a driver's license form. Former RCW 68.50-.540(3) (2003). A gift becomes irrevocable upon the death of the donor. Former RCW 68.50.540(8).

¶12 The WAGA limits the donees who may accept an anatomical gift and limits the purpose for which a gift may be made:

> (1) The following persons may become donees of anatomical gifts for the purposes stated:
>
> (a) A hospital, physician, surgeon, or procurement organization for transplantation, therapy, medical or dental education, research, or advancement of medical or dental science;
>
> (b) An accredited medical or dental school, college, or university for education, research, or advancement of medical or dental science; or
>
> (c) A designated individual for transplantation or therapy needed by that individual.
>
> (2) An anatomical gift may be made to a designated donee or without designating a donee. *If a donee is not designated or if*

---

[3] The trial court did not provide reasons for its order of summary judgment, and the hearing on the motion for summary judgment apparently was not transcribed. *See* Resp'ts' Answering Br. at 11. Therefore, we assume that the court granted summary judgment both on grounds that Respondents complied with the WAGA and that Adams's claims for relief were legally deficient under CR 56(c).

*the donee is not available or rejects the anatomical gift, the anatomical gift may be accepted by any hospital.*

Former RCW 68.50.570 (1993) (emphasis added). While subsection (1) lists all qualifying donees who may accept a gift, subsection (2) expressly authorizes only hospitals to accept such an undesignated anatomical gift.

¶13 In this case, Jesse indicated his intent to make an anatomical gift of any organ but did not designate a donee for such a gift. The donor card signed by Jesse simply provided: "I hereby make an anatomical gift to take effect upon my death. I give: [x] Any organ [ ] Specifically _____."[4] CP at 269. Jesse checked the "[a]ny organ" box and did not write in any specific body part that he intended to donate. As Jesse did not designate a donee, his anatomical gift is governed by former RCW 68.50.570(2), which authorizes only a hospital to accept such a gift. SMRI is not a "hospital" as defined under the WAGA. Former RCW 68.50.530(6) (2003). Therefore, the WAGA did not authorize SMRI to accept Jesse's undesignated anatomical gift.

¶14 Respondents do not claim that SMRI is a hospital. Instead, they claim that Jesse's undesignated gift permitted any qualifying donee, including SMRI, to receive his gift.[5] Respondents point out that under former RCW

---

[4] Adams contends that Jesse's donor card indicated the donation of only his organs and therefore did not authorize Respondents to take any blood and cerebral fluid samples. The WAGA defines an " '[a]natomical gift' " as "a donation of all or part of a human body." Former RCW 68.50.530(1) (2003). A " '[p]art' " is defined as "an organ, tissue, eye, bone, artery, blood, fluid, or other portion of a human body." Former RCW 68.50.530(7). As "organ" is listed separately from "blood" and "fluid," Jesse's gift of any organ technically did not include blood or fluid samples. However, the facts are undisputed that the blood and fluid samples were taken as part of SMRI's research on the brain. CP at 224-25. If Jesse made a valid gift of his organs to SMRI for the purpose of medical research, then such a gift would reasonably include the incidental extraction of blood and fluid samples.

[5] Adams argues that Respondents should be estopped from asserting that Jesse's anatomical gift authorized them to remove his brain because they did not know Jesse had made the gift at the time they removed his brain. Adams claims that Respondents relied on only her consent as authority for the gift at the time they removed the brain. However, an anatomical gift made by the donor is

68.50.570(2), a gift *"may* be accepted by any hospital," which they contend permits hospitals to accept donations but does not prohibit any other qualifying donee from accepting the gift. (Emphasis added.)

¶15 The canons of statutory construction do not permit such an interpretation. This court recognizes that "[o]missions are deemed to be exclusions." *In re Det. of Williams*, 147 Wn.2d 476, 491, 55 P.3d 597 (2002) ("Under expressio unius est exclusio alterius, . . . to express one thing in a statute implies the exclusion of the other."); *State v. Delgado*, 148 Wn.2d 723, 729, 63 P.3d 792 (2003). Hospitals are one of several qualifying donees under subsection (1), but hospitals are the only donee listed in subsection (2) as authorized to accept an undesignated gift. If the legislature did not intend to limit undesignated gifts to hospitals, then we assume that subsection (2) would have stated that any qualifying donee could accept such gifts.[6]

¶16 Respondents further claim that subsection (2) applies only when a person dies in a hospital and it does not limit the ability of other donees to accept gifts procured outside of a hospital. While subsections (1) and (2) do not mention anything about the place of death as determining the scope of the gift, Respondents look to the history of the Uniform Anatomical Gift Act (UAGA), 8A U.L.A.[7] to sup-

irrevocable upon the death of the donor and does not require the consent of any other person. Former RCW 68.50.540(8). If Jesse's gift authorized SMRI to take the brain, then Adams had no right to revoke that gift. Therefore, Respondents cannot be estopped from asserting that Jesse made a valid gift to SMRI. Furthermore, Respondents are not liable to Adams for failing to obtain documentation of Jesse's gift before performing the autopsy. While the WAGA requires the medical examiner to look for a document of gift by the decedent upon assuming jurisdiction over the body, former RCW 68.50.560(3)(a) (1993), it provides immunity for anyone who fails to perform such a duty, former RCW 68.50.560(6).

[6] For example, New Mexico's and Arizona's codification of their anatomical gift acts identify procurement organizations as appropriate donees for organs. N.M. STAT. ANN. § 24-6B-11(G)(3) (Supp. 2008) ("if the part is an organ, the gift passes to the appropriate organ procurement organization as custodian of the organ"); ARIZ. REV. STAT. ANN. § 36-850(G)(3) (Supp. 2007) (same).

[7] The UAGA originally was created in 1968. UAGA, 8A U.L.A. 69 (1968). It was revised in 1987 and 2006. UAGA, 8A U.L.A. 3 (1987); 8A U.L.A. 27 (2006) (Supp. 2008). Washington adopted the 1987 revision of the UAGA. *See* former RCW 68.50.520 (1993).

port its interpretation. The original version of the UAGA authorized the "attending physician" to accept a donor's undesignated gift. UAGA § 4(c), 8A U.L.A. 69, 130 (1968). Respondents propose that a situation in which the attending physician would accept a gift logically could arise only in a hospital. The 1987 revision of the UAGA, adopted in Washington, changed "attending physician" to "any hospital." UAGA § 6(b), 8A U.L.A. 3, 54 (1987); see former RCW 68.50.570(2). Respondents contend that this change was made merely to encourage donation sharing among hospitals whenever a donor dies in a hospital. However, the revised language drops any reference to the attending physician and therefore provides no grounds to infer that undesignated gifts are limited to hospitals only when a patient dies in a hospital under the care of a physician. By its very terms, the 1987 version indicates that any hospital may accept an undesignated gift without any regard of whether the donor died under the care of a physician. Nothing in this revised version suggests that the designation applies only when the donor dies in a hospital.

¶17 Our interpretation that undesignated anatomical gifts are limited to hospitals is consistent with the primary purpose of the WAGA to increase the number of anatomical gifts for donation. Former RCW 68.50.520 (1993). In enacting the WAGA, the legislature specifically declared that the demand for organs and body parts exceeded the supply for transplant. Former RCW 68.50.520(1). Although the WAGA goes on to permit donors to make an anatomical gift for purposes of research and medical education, the legislature did not acknowledge these purposes in its findings. Therefore, it makes sense that the legislature would direct undesignated gifts to a hospital, which could determine if there was a need for such an organ or body part for transplantation. If undesignated gifts were not directed to hospitals, then any donee could accept such a gift for any authorized purpose, without first determining if the organ could be used for transplantation.

¶18 Consistent with the legislative findings, we assume that one who makes an anatomical gift contemplates that

the gift could be used to satisfy the demand for transplants. On the other hand, it would be a stretch to assume that the legislature contemplated that undesignated gifts could be used for medical research or educational purposes even where a need for transplant exists. If SMRI or any other nonhospital wishes to increase donations, then they must obtain a specific designation from the donor or the family of the deceased or a donation from a hospital. Former RCW 68.50.540, .550 (2007).

## B

¶19 Apart from their reliance on Jesse's own anatomical gift, Respondents argue that they obtained Adams's consent to remove the brain. The WAGA instructs that an anatomical gift made by the donor does not limit the ability of an authorized person to make a further gift after the donor's death. Former RCW 68.50.540(10). Specifically, the WAGA authorizes a parent to make an anatomical gift of a child's body if the child has not expressly refused to make such a gift and has died without a spouse or issue. Former RCW 68.50.550(1)(e).

¶20 Respondents attempted to secure Adams's consent as Jesse's next of kin. Under former RCW 68.50-.550(1)(e), Adams could have made a valid anatomical gift to SMRI at that time. Of course, Adams alleges that she did not donate Jesse's entire brain or other organs to SMRI, which presents the critical question of fact in this case to be determined at trial. *See Sattler v. Nw. Tissue Ctr.*, 110 Wn. App. 689, 701, 42 P.3d 440 (2002) (reversing summary judgment because scope of consent to remove organ presented a question of material fact).

## III

¶21 Having determined that Jesse's undesignated gift did not authorize SMRI to remove his brain, we must address Adams's theories of liability for the alleged unau-

thorized removal.[8] Adams seeks both statutory and common law remedies, which we discuss in turn.

## A

¶22 Adams claims that the WAGA provides a cause of action for violation of its terms. While the WAGA does not expressly create a civil remedy, Adams argues that it implies a remedy from the various provisions protecting the choice of the decedent and family members to make an anatomical gift. Respondents counter that implying a cause of action does not serve the purpose of the WAGA because it was not created to benefit family members of decedents.

¶23 This court will imply a statutory cause of action under a three-prong test:

[F]irst, whether the plaintiff is within the class for whose "especial" benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation.

*Bennett v. Hardy*, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990). In *Bennett*, this court recognized that the implied cause of action is premised on the assumption that the legislature would not specifically grant rights to a class of persons "without enabling members of that class to enforce those rights." *Id.* at 921. Therefore, we must determine whether the WAGA specifically granted a right for family members to authorize the donation of a body part or organ of the deceased that would require us to imply a remedy protecting such a right.

---

[8] The WAGA also provides immunity for a "hospital, physician, surgeon, coroner, medical examiner, . . . or other person" who *"attempts"* to act in accordance with the WAGA in good faith. Former RCW 68.50.620(3) (1993) (emphasis added). Respondents may have a valid defense that they attempted to comply with the WAGA. While Respondents did raise the good faith immunity defense in their amended answer, they do not directly argue on appeal that they made a good faith attempt to comply with the WAGA. Such an issue presents a question of fact beyond the scope of our review. *See Sattler*, 110 Wn. App. at 701.

¶24 The question of whether the WAGA provides an independent cause of action was recently considered in *Amaker v. King County*, 479 F. Supp. 2d 1162, 1163 (W.D. Wash. 2007), *aff'd*, 2008 WL 4104234, 2008 U.S. App. LEXIS 18453 (9th Cir.) (unpublished). In that case, the federal district court applied the *Bennett* test and rejected any implied cause of action under the WAGA. The court determined that the legislature enacted the WAGA to increase the number of organ donations for transplantation, not to protect family members of an organ donor. *Id.* The court further held that the WAGA did not grant rights to any identifiable class of persons. *Id.* at 1163-64. Finally, the court held that an implied cause of action would not serve the purpose of the WAGA to encourage organ donations. *Id.* at 1164. We look to the reasoning in *Amaker* as persuasive authority.

¶25 As to the first *Bennett* prong, this court "look[s] to the language of the statute to ascertain whether the plaintiff is a member of the protected class." *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 475, 951 P.2d 749 (1998). The WAGA does not specifically benefit family members of organ donors. The legislature enacted the WAGA in order "to provide a program that will increase the number of anatomical gifts available for donation." Former RCW 68.50.520(4). Consistent with this purpose, the WAGA established procedures to facilitate the procurement of anatomical gifts. These procedures require potential donees to obtain the family's consent where the deceased had not made a gift before death. Former RCW 68.50.550. However, the WAGA does not create the family members' right to authorize a gift. Family members have the right to control the disposal of the body of a deceased relative where the deceased has not made prearrangements for disposal. RCW 68.50.160(3). Furthermore, family members derive an interest in the proper treatment of the body of a deceased relative under the common law, which as discussed below provides its own remedies to protect such a recognized interest. Therefore, the WAGA's procedures required to

obtain consent do not grant rights to family members that require special protection because absent the WAGA, potential donees presumably would still have to seek the consent of the donor or family of the deceased before procuring an organ or body part.

¶26 Adams claims that the legislature intended to protect the interests of all who are involved in the donation process. She relies on *Tyner v. Department of Social & Health Services*, 141 Wn.2d 68, 79, 1 P.3d 1148 (2000), in which this court recognized that the State's duty to investigate child abuse under RCW 26.44.050 created an implied cause of action for parents under investigation. In that case, the parties agreed that the statute specifically benefited child victims of abuse. *Id.* at 77. The issue was whether that benefit extended to the entire family unit in order to meet the *Bennett* analysis. Under the statute at issue, the legislature recognized the " 'paramount importance' " of the parent-child relationship " 'and any intervention into the life of a child is also an intervention into the life of the parent.' " *Id.* at 78 (quoting RCW 26.44.010). This legislative finding led the court to conclude that the benefit extended to protect the interests of parents from unwarranted separation from their children.

¶27 Unlike the statute at issue in *Tyner*, the WAGA creates procedures for the procurement of organs, not for the protection of persons who donate organs. While the legislative purpose of the WAGA declares that "[d]iscretion and sensitivity must be used in discussion and requests for anatomical gifts," former RCW 68.50.520(4), such language does not create a specific right or benefit like the kind in *Tyner.*

¶28 The second and third *Bennett* prongs also fail. As noted above, the legislature created the WAGA to increase the procurement of anatomical gifts. The legislature even provided immunity for anyone who complies with the WAGA or attempts to comply in good faith. Former RCW 68.50.620(3) (1993). Establishing good faith immunity serves the legislative purpose by encouraging potential

donees to seek anatomical gifts without increasing the risk of liability. Implying a cause of action would be inconsistent with the effort to encourage the increased procurement of anatomical gifts. *See Amaker*, 479 F. Supp. 2d at 1164.

¶29 Adams argues that the good faith immunity actually indicates that the legislature implicitly recognized liability for all bad faith violations of the WAGA. However, if the legislature had intended to provide a remedy under the WAGA, it would have expressly created the liability to which the immunity corresponds. Furthermore, as Respondents point out, the comment to the revised UAGA of 2006 recognizes that "if a person acts in subjective 'bad faith,' the common law provides remedies." UAGA § 18 cmt., 8A U.L.A. 27, 70 (2006) (Supp. 2008). In this case, Adams has raised several common law claims against Respondents for the failure to obtain her consent. These claims are based on her asserted interest in Jesse's body, not on the WAGA.

## B

¶30 Adams's complaint raised a cause of action titled "Tortious Interference with a Dead Body Restatement (Second) of Torts § 868 [1979]." CP at 193-94. This court has never adopted that section of the *Restatement*. However, this court has recognized a common law action for tortious interference with a dead body. *See Wright v. Beardsley*, 46 Wash. 16, 20, 89 P. 172 (1907); *Gadbury v. Bleitz*, 133 Wash. 134, 136, 233 P. 299 (1925). We recently affirmed the viability of the tort in *Reid v. Pierce County*, 136 Wn.2d 195, 207, 961 P.2d 333 (1998) (citing *Wright* and *Gadbury*). Respondents argue that Adams did not plead a common law claim and therefore this action should be dismissed. *See Amaker*, 479 F. Supp. 2d at 1163-64. Adams claims that the cause of action includes both the *Restatement* and the common law claims.

¶31 The complaint properly raised a claim under the common law action for tortious interference with a dead body. Our state rules of civil procedure merely require that

a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." CR 8(a). The complaint simply must give sufficient notice to the defendant of the nature of the claim being brought. *Lightner v. Balow*, 59 Wn.2d 856, 858, 370 P.2d 982 (1962) ("[P]leadings are primarily intended to give notice to the court and the opponent of the general nature of the claim asserted."). We liberally construe pleading requirements in order "to facilitate proper decision on the merits, not to erect formal and burdensome impediments to the litigation process." *State v. Adams*, 107 Wn.2d 611, 620, 732 P.2d 149 (1987).

¶32 The complaint in this case gave sufficient notice to Respondents of the nature of the claim brought against them. The only difference pointed out by Respondents between the common law action and the *Restatement* is that the *Restatement* permits liability for negligence, whereas the common law requires willful conduct.[9] Such a distinction does not warrant the dismissal of the entire cause of action for improper pleading. *Id.* ("If a complaint states facts entitling the plaintiff to some relief, it is immaterial by what name the action is called."). The complaint alleged that Respondents "intentionally, recklessly, and/or negligently" removed Jesse's organs without permission. CP at 193. Therefore, the complaint sufficiently apprised Respondents that they would have to defend against a claim of intentional misuse of Jesse's body. Furthermore, Adams correctly cited the common law tort in her response to summary judgment. CP at 329-31; *Adams*, 107

---

[9] Adams also argues that this court should adopt the *Restatement*, presumably to include claims of negligence. However, this court has rejected a claim of negligent misuse because recovery is premised on mental suffering. *Gadbury*, 133 Wash. at 136 ("[I]f [mental] suffering is the direct result of a wilful wrong as distinguished from one that is merely negligent, then there may be a recovery."). Adams has not demonstrated why the facts of this case warrant extension of the tort to cover negligent conduct. Furthermore, negligence claims likely would be covered under the WAGA's immunity provision for attempting to comply with the WAGA in good faith. *See Ramirez v. Health Partners of S. Ariz.*, 193 Ariz. 325, 333, 972 P.2d 658 (Ct. App. 1998) (refusing to recognize negligence liability for violation of UAGA in light of good faith immunity).

Wn.2d at 620 ("[I]nitial pleadings which may be unclear may be clarified during the course of summary judgment proceedings.").

¶33 The tort of interference with a dead body allows recovery for mental suffering derived from the willful misuse of a body. *Gadbury*, 133 Wash. at 136 ("[I]f [mental] suffering is the direct result of a wilful wrong as distinguished from one that is merely negligent, then there may be a recovery."). The action is not based on a property interest in the body itself, but rather an interest in the proper treatment of the body. *See Herzl Congregation v. Robinson*, 142 Wash. 469, 471, 253 P. 654 (1927) (recognizing generally that "there is a right of custody over, and interest in, a dead body, and the disposal of the body"); *Wright*, 46 Wash. at 19 ("the action is for a wrong against the feelings of the plaintiffs inflicted by a wrongful and improper burial of their dead"). The interest extends to relatives of the deceased and those who control the right to dispose of the body. *See Gadbury*, 133 Wash. at 139 ("those persons who by relationship have a peculiar interest in seeing that the last sad rites are properly given the deceased may maintain the action"); RCW 68.50.160(3).

¶34 While the parameters of the misuse that gives rise to a cause of action for tortious interference might be difficult to grasp firmly,[10] this court may have best described it as misuse "in such a manner as to cause the relatives or persons charged with its decent sepulture to naturally suffer mental anguish." *Wright*, 46 Wash. at 20. Furthermore, we need not attempt to define more precisely the nature of such misuse as the extent or nature of the interference alleged generally does not bar recovery. *See Gadbury*, 133 Wash. at 137-38 ("[T]he extent or degree of the misuse ought not to prevent recovery.").

¶35 This court first recognized an actionable claim of the tort for an improper burial in *Wright*, where an undertaker

---

[10] Indeed, one court in expounding upon the basis for this tort proposed that "[a] corpse in some respects is the strangest thing on earth." *Louisville & Nashville R.R. v. Wilson*, 123 Ga. 62, 63, 51 S.E. 24 (1905).

had buried the corpse of a child in the same grave as another body and only six inches from the surface. 46 Wash. at 17. The court denied liability under a breach of contract theory for failing to bury the child according to agreement because the plaintiffs based their claim for damages on mental suffering. Nevertheless, the court went on to conclude that "it would shock the sensibilities to hold that there was no remedy for such a wrong." *Id.* at 20. The court noted that the tort of wrongful interference traditionally related to the mutilation of a corpse, but concluded that an improper burial equated to a mutilation for purposes of raising an actionable claim. *Id.* (recognizing that a cause of action for wrongful mutilation "applies as well to a case such as the one at bar where the wrong consists of the manner of burial").

¶36 Later, in *Gadbury*, this court upheld a claim where an undertaker withheld a body from the mother of the deceased as collateral for payment of funeral expenses. 133 Wash. 134. While the court noted that a party cannot recover for mental suffering based solely on a claim of negligence, it held that intentionally withholding the proper burial of a body constituted a willful misuse of the body. *Id.* at 137. The court determined that willful delay in providing a burial was equivalent to the improper burial at issue in *Wright* for purposes of the tort. *Id.* Like *Wright*, the court focused on the emotional effect of the treatment of the corpse rather than the extent of misuse. *Id.* at 137-38 ("The misuse in one case may be greater in degree, but nevertheless it is a misuse."); *see Wright*, 46 Wash. at 20.

¶37 We believe that the unauthorized removal of a brain for use in scientific research involves the same kind of interference that causes mental suffering as would an improper burial or use of a body as collateral for payment of a debt. The permanent removal of the entire brain certainly can be considered a mutilation of the body. Furthermore, as mother of the deceased, Adams falls within the recognized category of plaintiff who can maintain a claim for mental suffering from such misuse. *See Wright*, 46 Wash. at 20

(" 'That mental suffering and injury to the feelings would be ordinarily the natural and proximate result of knowledge that the remains of a deceased husband had been mutilated is too plain to admit of argument.' " (quoting *Larson v. Chase*, 47 Minn. 307, 312, 50 N.W. 238 (1891))).

¶38 Respondents argue that the interference with Jesse's body was proper because the medical examiner has authority to remove organs while conducting an autopsy. RCW 68.50.106. However, such authority does not imply that the medical examiner has authority to retain the brain and merely return a veritable shell of the skull to the family for burial, absent some compelling reason for further examination. Here, the medical examiner found no abnormality in the brain and gave it to SMRI for its own private research. These facts clearly support an action for mental suffering based on the alleged misuse of a body.

¶39 We hold that Adams has raised an actionable claim for tortious interference with a dead body. Of course, Adams still must prove the elements of this tort at trial and our opinion does not determine the satisfaction of any of such elements as a matter of law. Furthermore, the extent of injury presents a question of fact outside the scope of our review on summary judgment. *See Gadbury*, 133 Wash. at 138.

## C

¶40 Adams claims that Respondents conspired to procure Jesse's body tissue without Jesse's or Adams's consent. "A conspiracy is a combination of two or more persons who contrive to commit a criminal or unlawful act, or to commit a lawful act for criminal or unlawful purposes." *John Davis & Co. v. Cedar Glen # Four, Inc.*, 75 Wn.2d 214, 223, 450 P.2d 166 (1969).

¶41 In this case, Respondents agreed to procure organs and body parts to be used for medical research. CP at 252-57. While such an underlying agreement was not itself illegal, Adams alleges that Respondents agreed to procure Jesse's brain without Adams's consent. The pro-

curement of an organ without the consent of the deceased or an authorized family member would violate the WAGA and therefore constitute an unlawful act. We hold that this allegation raises a question of fact sufficient to overcome summary judgment.

## D

■ ¶42 Adams claims that Respondents invaded her privacy interests by turning over Jesse's body tissue and confidential records to SMRI. This court has adopted the *Restatement (Second) of Torts* § 652D (1977), recognizing a cause of action for invasion of privacy. *Reid,* 136 Wn.2d at 212-13. The tort premises liability on the publication of a private matter that would be highly offensive to a reasonable person and is not a legitimate concern to the public. *Id.* at 210.

¶43 In *Reid,* this court held that relatives of a deceased person have a privacy interest in the autopsy photos of the deceased. *Id.* at 212. The court reasoned that the autopsy photos were part of the intimate details of the relatives' lives in maintaining the dignity of the deceased. *Id.* at 210, 212. The court found support for this protection in the public policy expressed by the legislature to require that autopsy reports remain confidential. *Id.* at 210-11; RCW 68.50.105.

■ ¶44 Adams's claim fails to allege any publication of private matters. While *Reid* supports Adams's claim that she has a privacy interest in Jesse's autopsy records, she does not allege that such records were published. Respondents entered into an agreement to share autopsy records, in which SMRI agreed to abide by all state privacy and confidentiality laws applicable to the medical examiner. CP at 256. Adams does not assert that SMRI breached such confidentiality. While a research facility may eventually have assimilated its research of Jesse's brain into data as part of a scientific publication, such filtered information likely would no longer contain any recognizable private

matters connected to Jesse. Such dissemination does not rise to a highly offensive level like the publication of autopsy records to friends at a social gathering. *See Fisher v. Dep't of Health*, 125 Wn. App. 869, 880, 106 P.3d 836 (2005). Therefore, we hold that the trial court properly dismissed Adams's privacy claim.

E

¶45 Adams claims that Respondents fraudulently obtained her consent to remove Jesse's organs. Fraud must be pleaded with particularity. CR 9(b). Particularity requires that the pleading apprise the defendant of the facts that give rise to the allegation of fraud. *See Pedersen v. Bibioff*, 64 Wn. App. 710, 721, 828 P.2d 1113 (1992); *Harstad v. Frol*, 41 Wn. App. 294, 301-02, 704 P.2d 638 (1985). Respondents do not argue that Adams's claim of fraud is lacking particularity, but instead argue that any alleged misstatements made to Adams were irrelevant because Jesse gave an unrestricted gift. While we reject such a defense, we hold that Adams has failed to make a facial claim of fraud.

¶46 The elements of fraud include

(1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

*Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996). Adams does not allege the misrepresentation of an existing fact. Instead, she claims that Respondents fraudulently represented their intent to take a sample of Jesse's brain tissue in attempting to obtain her consent. However, a false promise does not constitute the representation of an existing fact. *Id.* at 505-06 (holding that "a promise of future performance [is] not a representation of *existing* fact").

■■■ ¶47 According to Adams, Respondents asked for her consent to take a sample of Jesse's brain tissue. Adams alleges that she gave such limited consent. Consistent with her given consent, the form completed by Dr. Haikal asserted that Adams agreed to donate Jesse's "brain tissue," not his entire brain. CP at 234. Therefore, Respondents did not obtain Adams's consent by fraud or fraudulently misrepresent the scope of her consent. Essentially, Adams claims that Respondents broke their agreement to take a tissue sample rather than the entire brain. A broken promise does not support an action for fraud.

¶48 The real issue in this case is the scope of Adams's consent, not the fraudulent inducement to obtain her consent. Regardless of whether Respondents actually intended to take a sample or the entire brain, Adams consented to donate a sample of Jesse's brain tissue. While these facts support an action under other theories of recovery, Respondents did not commit fraud if they exceeded the scope of her consent.

## CONCLUSION

¶49 We hold that the WAGA did not authorize SMRI to accept Jesse's undesignated anatomical gift. However, we affirm the order for summary judgment on Adams's claims for violation of the WAGA, fraud, and invasion of privacy. We reverse and remand on the remaining claims of tortious interference with a dead body and conspiracy.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, SANDERS, CHAMBERS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., concur.