[No. 65336-9-I.   Division One.   May 23, 2011.]

Kenneth House, *Appellant*, v. The Estate of Michael L. McCamey et al., *Respondents*.

---

*Philip J. Buri* (of *Buri Funston Mumford PLLC*), for appellant.

*Daniel F. Ganfield*; and *Mary H. Spillane* (of *Williams Kastner & Gibbs*), for respondents.

¶1 LAU, J. — enneth House appeals the trial court's summary judgment order dismissing his negligent entrustment personal injury lawsuit. Because House demonstrates no material fact issues regarding whether William McCamey knew or reasonably should have known that his son, Michael McCamey, was a reckless, heedless, or incompetent driver, we affirm the dismissal order.

## FACTS[1]

¶2 Viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record shows the following facts. In 1975, when he was about 18 years old, Michael McCamey moved out of his parents'

---

[1] For clarity, we use the McCameys' first names.

home. He later married, raised a family of three sons, and divorced. From 1977 to 1995, Michael developed an extensive criminal and traffic offense record,[2] which included five felonies, three gross misdemeanors, six misdemeanors, two unclassified offenses, and a 1995 driving under the influence (DUI) for which he received a deferred prosecution.[3] During this period, he also received four speeding tickets, three driving without liability insurance tickets, and one "no license on person" ticket. In February 1997, Michael was sentenced to 132 months in prison on his two 1997 child molestation convictions.

¶3 As the Department of Corrections (DOC) prepared to parole Michael in late 2005, he signed an authorization permitting the DOC to release certain files to his father, William McCamey. The files included (1) Michael's educational history, (2) his psychiatric evaluation, (3) his psychological evaluation, (4) his drug alcohol assessment, (5) his progress in treatment, (6) his presentence report, (7) his assessment or reassessment of risk forms, (8) his criminal history, and (9) anything pertaining to his release plan to Island County. Michael planned to live in a rental home that William owned on Camano Island. The plan, however, fell through, and Michael moved in with his girl friend, Terry Dahlin, in Everett, on April 12, 2006.

¶4 Michael's parole conditions prohibited him from drinking alcohol, among other restrictions. But Michael resumed drinking in June 2006. Dahlin testified that he

---

[2] *Felonies*: 1986—malicious mischief, second degree; 1989—indecent liberties; 1994—possession with intent to deliver/manufacture marijuana; 1997—child molestation; 1997—child molestation.

*Gross Misdemeanors*: 1986—criminal trespass; 1987—simple assault; 1995—assault, fourth degree.

*Misdemeanors*: 1977—no valid driver's license; 1977—no valid driver's license; 1980—obstructing a public servant; 1981—resisting arrest; 1985—restraining order violation; 1987—nonappearance after promise to appear.

*Unknown Classification*: 1980—possession of marijuana; 1993—malicious mischief.

[3] Michael's Washington State Patrol criminal history record shows no DUI conviction, suggesting that he satisfactorily completed an alcohol treatment program and other court ordered conditions. RCW 10.05.120.

drank around 12 beers about two or three times a week. She also testified that she mentioned to William in a telephone call in June 2006 that Michael was drinking, using drugs, and abusing her. She told William that Michael was drinking beer about twice a week but did not tell him how much beer he was drinking. Soon after, she stopped talking to William about Michael's drinking. Although Michael drove her car after drinking, she never told William about it.

¶5 During a routine traffic stop on August 9, police ticketed Michael for driving without liability insurance, driving without a valid driver's license, and driving without proper vehicle tabs. Nothing in the record establishes that William knew about these traffic tickets. From August 15 to 30, Michael was incarcerated for violating the terms of his parole because a breath test administered by his parole officer showed he had consumed alcohol, in violation of his parole conditions. His test results revealed a 0.006 reading.[4]

¶6 On October 4, Michael obtained a valid driver's license. About three weeks later, William purchased a 1973 Dodge pickup truck for Michael's use. William insured it and held valid title and registration in his own name. In early November, William and Michael's brother, Steve, delivered the pickup truck to Michael.[5]

¶7 Around November 6, Dahlin alleged Michael assaulted her, and she demanded he leave her home. Two days later, Michael was arrested and incarcerated for 30 days pending a parole violation hearing based on the assault allegation. After Dahlin recanted her assault allegation, Michael was released from jail on a "not guilty" finding. On November 26, while Michael was in jail, William purchased an umbrella liability insurance policy. Neither the policy nor evidence of the coverage amount appears in the record.

¶8 Michael was released from jail on December 5. The next day, while driving the truck to the home of his former wife, Toni Fitzgerald, to pick up some belongings, Michael

---

[4] An alcohol concentration of 0.10 was the legal limit in 1995.

[5] William lived in Republic, Ferry County.

approached a stop sign, "looked down for directions and looked back up." Michael ran the stop sign and collided with the passenger side of House's van. Michael admitted fault and police ticketed him for running the stop sign. House suffered significant injuries, including a closed head injury and loss of function in his pituitary gland, leading to hormone deficiencies. The record shows no evidence that Michael was intoxicated by drugs or alcohol at or near the time of the accident. And the record indicates no evidence that police suspected Michael had consumed alcohol or drugs when the collision happened. Fitzgerald, who came to the accident scene at Michael's request, testified that she did not smell any alcohol on Michael's breath or notice slurred speech or trouble moving or walking. She further testified he was not "stoned" and "[h]e was totally all right."

¶9 House filed this lawsuit against Michael in August 2008. The following month, Michael died. House then amended his complaint to name as defendants the estates of both Michael and William[6] and to assert vicarious liability and negligent entrustment claims against William's estate. In 2010, the trial court dismissed the vicarious liability claim on summary judgment. The following month, the trial court dismissed the negligent entrustment claim against William's estate on its summary judgment motion. House appeals only the summary judgment dismissal of his negligent entrustment claim.

## STANDARD OF REVIEW

¶10 When reviewing a summary judgment order, we engage in the same inquiry as the trial court, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). The nonmoving party may not rely on mere allegations, denials, opinions, or conclusory statements but must set forth specific admis-

---

[6] William died in January 2007.

sible facts to show there is a genuine issue for trial. *Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co.*, 122 Wn. App. 736, 744, 87 P.3d 774 (2004); CR 56(e). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Jones*, 146 Wn.2d at 300-01.

## *ANALYSIS*

¶11 House argues that the trial court erred in granting William's motion for summary judgment because he raised material fact issues regarding whether William knew or reasonably should have known that Michael was an incompetent, reckless driver. House claims the following facts raise material issues of fact justifying a trial: (1) Michael's 1977 to 1997 criminal and traffic infraction history, (2) the DOC files provided to William detailing Michael's criminal and substance abuse history and DOC's assessment of his psychological status and propensity to reoffend, (3) William's knowledge about Michael's drug and alcohol use postprison, (4) William's purchase of the umbrella liability policy, and (5) the expert's testimony about "post acute withdrawal." William's estate responds that none of this evidence raises a material fact issue.

¶12 Negligent entrustment is a "well-established" common law doctrine. *Christen v. Lee*, 113 Wn.2d 479, 499, 780 P.2d 1307 (1989). The party asserting negligent entrustment must establish that the person entrusting the vehicle knew, or should have known in the exercise of ordinary care, "that the person to whom the vehicle was entrusted is reckless, heedless, or incompetent." *Mejia v. Erwin*, 45 Wn. App. 700, 704, 726 P.2d 1032 (1986). A claim of negligent entrustment is premised on foreseeability—the entrustor of a vehicle is liable only if a reasonable person could have foreseen the negligent acts of the entrustee. *Mejia*, 45 Wn. App. at 705-06. When the foreseeability of some harm stems from past actions or conduct, then it must

be " 'conduct so repetitive as to make its recurrence foreseeable.' " *Mejia*, 45 Wn. App. at 706 (emphasis omitted) (quoting *Curley v. Gen. Valet Serv., Inc.*, 270 Md. 248, 267, 311 A.2d 231 (1973)). Therefore, to establish liability for negligent entrustment, House must show that William knew or, in the exercise of ordinary care, should have known about the danger of relinquishing control of the pickup truck to Michael.

¶13 Division Two of this court addressed similar issues involving negligent entrustment of a car to an adult child in *Mejia*. There, Felix Erwin rented a car under his name and entrusted it to his 29-year-old son, Phillip, in 1980. A week later, Phillip crashed the car, killing himself and severely injuring his passenger, Mejia, who then sued Felix, alleging a negligent entrustment claim.

¶14 At summary judgment, Mejia presented evidence that in 1969 when Phillip was a teenager, Phillip had been insured under his parents' PEMCO automobile insurance policy. In July 1969, PEMCO terminated Phillip's coverage and advised the Erwins about the termination, citing Phillip's three speeding violations within four months in 1968. An internal PEMCO report indicated that Phillip had been involved in two car accidents before the 1969 termination. There was no evidence that Felix knew about this report. But at his deposition, he admitted knowledge about an accident in 1968 or 1969 in which Phillip swerved to avoid hitting a dog and collided with a mailbox. Felix also described Phillip's driving as he matured, " 'I always thought he was an excellent driver. I couldn't notice any improvement or downgrading of his driving.' " *Mejia*, 45 Wn. App. at 702.

¶15 PEMCO insured Phillip again under his own policy from 1975 to 1980 when he was living alone and entirely self-supporting. During this time period, PEMCO paid several claims in 1975 and 1976 for Phillip's accidents, and his driving record showed he was involved in four accidents from 1976 to 1980 and received five traffic citations from 1971 to 1978 for speeding and one for disobeying a road

sign. There was no evidence presented that Felix knew about any of Phillip's traffic infractions or accidents after 1969.

¶16 The court held, "As a matter of law, Phillip's citations and accident 11 years before the date of the alleged entrustment were too remote in time to permit the question of Felix's alleged negligence to go to the jury." *Mejia*, 45 Wn. App. at 706. While acknowledging the general principle that negligence is generally a jury question, the court reasoned, "After some period of time, knowledge of an entrustee's previous reckless acts should have little bearing on the entrustor's present perception of the entrustee's competence to drive at the time of the entrustment." *Mejia*, 45 Wn. App. at 705.

¶17 And as our Supreme Court explained,

> While an automobile is not regarded in law as an inherently dangerous instrumentality, and the owner thereof is not generally liable for its negligent use by another to whom he loans or intrusts it for that other's purposes, yet there is an exception to the rule. *If the owner loans or intrusts his automobile to another person, even for that person's purposes, who is so reckless, heedless or incompetent in his operation of automobiles* as to render the machine while in his hands a dangerous instrumentality, he is liable if he knows, *at the time he so intrusts it*, of the person's character and habits *in that regard.*

*Jones v. Harris*, 122 Wash. 69, 74, 210 P. 22 (1922) (emphasis added).

¶18 Here, we presume Michael was a competent and qualified driver because he passed both written and road tests and was issued a valid Washington State driver's license on October 4, 2006, just two months before the December 6 accident. *Vikelis v. Jaundalderis*, 55 Wn.2d 565, 570, 348 P.2d 649 (1960) (noting in negligent entrustment case that "in view of the fact that Talis had a valid and subsisting driver's license, at the time, we must presume as a matter of law that he was competent and qualified to operate his parents' car").

¶19 House contends, however, that Michael's criminal history establishes a jury question on whether William knew or reasonably should have known that Michael was an incompetent, reckless driver when he entrusted the pickup to Michael. Although the record shows Michael was convicted during the 1980s and 1990s of 16 adult criminal offenses, only one of those related to Michael's driving—the 1995 DUI for which he received a deferred prosecution in 1996.[7] But Michael's Washington State Patrol criminal history record indicates no DUI conviction was ever entered.

¶20 House cites no authority that the types of crimes that Michael had committed—crimes against persons and property, nonmoving traffic violations, and marijuana possession offenses—reasonably establish that a person is an incompetent, reckless driver under a negligent entrustment claim.[8] " 'Where no authorities are cited in support of a proposition, [we are] not required to search out authorities, but may assume that counsel, after diligent search, has found none.' " *McCormick v. Dunn & Black, PS*, 140 Wn. App. 873, 883, 167 P.3d 610 (2007) (internal quotation marks omitted) (quoting *State v. Logan*, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000)).

¶21 In addition, the record shows no evidence that William knew or should have known about Michael's adult criminal record or his driving record. Michael moved out of his parents' home in 1975 when he was 18 years old. He later married, established his own home, raised his three sons, and then divorced. When the December 6, 2006

---

[7] Under the deferred prosecution statute, chapter 10.05 RCW, an eligible person charged with DUI may petition the court for a deferred prosecution program, which includes a court ordered alcohol treatment plan and other requirements. Upon successful completion of the deferred prosecution program, the court is required to dismiss the DUI charge.

[8] House claims that Michael was arrested for reckless driving in 1995. His brief cites to "Exhibit[s] 4 & 14 to Mechtenberg Dec." Appellant's Br. at 5. This claim is not supported by these exhibits. And because the four speeding tickets occurred more than 11 years before the 2006 accident, they are too stale, as a matter of law, to establish William's knowledge that Michael was an incompetent, reckless driver. *Mejia*, 45 Wn. App. at 705-06.

accident occurred, Michael was 49 years old and had last lived with his father 31 years before the accident.[9] Even if we assume William knew about Michael's past driving record and the DUI arrest, the record shows no evidence that Michael was speeding or under the influence of alcohol or drugs when he ran the stop sign and collided with House's van. Notably, the record indicates that Michael had never caused an accident before December 6, 2006 or been ticketed for running a stop sign.

¶22 And House cites no contrary authority or persuasive basis on which to distinguish *Mejia*. Like in *Mejia*, all of Michael's 1977 to 1997 criminal and traffic offenses, including his 1995 DUI, are insufficient as a matter of law to establish liability for negligent entrustment.

¶23 Indeed, the record demonstrates no evidence that William ever rode as a passenger in a vehicle driven by Michael or observed Michael drive recklessly or negligently. The unchallenged testimony of three witnesses about Michael's driving habits after his release on parole—Steve McCamey, Terry Dahlin,[10] and Toni Fitzgerald—indicate they considered him to be a safe driver.

¶24 House nonetheless asserts that William must have known about Michael's criminal behavior as an adult because he received Michael's DOC files in preparation for his release on parole. He relies on the October 10, 2005 authorization for release of DOC files signed by Michael. Our review of the record indicates no evidence that DOC pro-

---

[9] From the police report, House asserts William knew about Michael's September 1995 DUI arrest because he picked Michael up from the police station two hours after the arrest. Beyond the fact of arrest, there is no other evidence of William's knowledge about this DUI in our record.

[10] House also relies on Dahlin's testimony about Michael's postprison drinking, drug use, and general abuse toward her to establish William's knowledge of Michael's reckless driving habit. But House fails to show this conduct was the proximate cause of damages. " 'The liability of the owner does not arise by merely proving that he gave permission to an incompetent driver to drive his automobile but it must also appear that the incompetency alleged was the proximate cause of the commission of the . . . act which caused the injury.' " *Kunkel v. Alger*, 10 Mass. App. Ct. 76, 406 N.E.2d 402, 407 (1980) (alteration in original) (quoting *Bensman v. Reed*, 299 Ill. App. 531, 534, 20 N.E.2d 910 (1939)); RESTATEMENT (SECOND) OF TORTS § 390 cmt. b (1965).

vided William with the files or that William received or read them. Although House argues William "had an obligation to read the [DOC] files," he cites no authority establishing such a duty. Appellant's Br. at 20.

¶25 House maintains that chemical dependency expert Cindy Brown's testimony that Michael failed to stop at the stop sign because he was distracted due to "post acute withdrawal" precludes summary judgment dismissal. The record reveals no evidence William knew or reasonably should have known that Michael would be so impaired by *lack* of alcohol as to cause him to be an incompetent, reckless driver.

¶26 House then asserts that William's purchase of $1 million in umbrella liability insurance on November 26, 2006, 10 days before the accident, permits an inference that William "understood the unreasonable risk from Michael's behavior." Appellant's Br. at 21. The record here indicates no evidence to support this speculative assertion.[11] *Adams v. King County*, 164 Wn.2d 640, 647, 192 P.3d 891 (2008) (To preclude summary judgment, the facts "must move beyond mere speculative and argumentative assertions.").

¶27 For the reasons discussed above, we conclude that the trial court properly granted the William estate's summary judgment motion. House failed to present sufficient evidence from which a fact finder could reasonably conclude that Michael was an incompetent, reckless driver when William entrusted him with the pickup truck. We further conclude, as a matter of law, that Michael's 1977 to 1997 criminal and traffic offenses are too remote in time to create a factual issue on William's knowledge. *Mejia*, 45 Wn. App. at 704-06. We affirm the order dismissing House's negligent entrustment claim.

GROSSE and ELLINGTON, JJ., concur.

Review denied at 173 Wn.2d 1005 (2011).

---

[11] At Dahlin's deposition, House's counsel asked her whether she had been aware of William's purchase of an umbrella policy "for a million dollars." She responded, "No." Steve McCamey was likewise unaware of such an umbrella policy.