IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DONALD R. SWANK, individually and as personal representative of the ESTATE OF ANDREW F. SWANK, and PATRICIA A. SWANK, individually, | ) ) ) ) ) | No. 33782-1-III |
| Appellants, | ) ) | |
| v. | ) ) | |
| VALLEY CHRISTIAN SCHOOL, a Washington State Non-profit Corporation, JIM PURYEAR, and TIMOTHY F. BURNS, M.D. individually, | ) ) ) ) ) | PUBLISHED OPINION |
| Respondents, | ) ) | |
| MIKE HEDEN and DERICK TABISH, individually, | ) ) ) | |
| Defendants. | ) | |

LAWRENCE-BERREY, J. — In 2009, the Washington Legislature passed the

Zackery Lystedt law, RCW 28A.600.190, entitled "Youth Sports—Concussion and Head

Injury Guidelines." High school junior Andrew (Drew) Swank, an Idaho resident, played

football for Valley Christian School (VCS), located in Spokane Valley, Washington. On

September 18, 2009, Drew sustained a head injury during a game. Days later, Dr. Timothy Burns, an Idaho physician, saw Drew in his Idaho clinic and diagnosed Drew as having sustained a concussion. Later that week, Dr. Burns received word that Drew's headaches were gone and cleared Drew to return to play. The next day, one week after receiving his concussion, Drew played his final football game. During the game, Drew showed signs of a continued concussive injury. He remained in the game, was hit hard by an opposing player, and shuffled off the field. Two days later, Drew died.

In September 2012, Drew's parents, Donald and Patricia Swank, filed a wrongful death suit against multiple entities, including VCS, head football coach Jim Puryear, and Dr. Burns. The suit alleged causes of action for negligence, medical negligence, and violation of the Zackery Lystedt law. On summary judgment, the Spokane County Superior Court dismissed the claims against all defendants. The Swanks appeal.

We hold (1) the Zackery Lystedt law does not create an implied cause of action, but the violation of the Zackery Lystedt law by one on whom the law imposes a duty may be evidence of negligence, (2) genuine issues of material fact preclude summary dismissal of VCS even though Dr. Burns cleared Drew to return to play, when Mr. Puryear permitted Drew to continue playing even after Drew showed observable signs of continued concussive injury, (3) the nonprofit volunteer immunity statute, RCW 4.24.670,

2

insulates Mr. Puryear from personal liability for simple negligence, and (4) Washington

lacks personal jurisdiction over Dr. Burns, an Idaho physician, for alleged medical

malpractice occurring in Idaho. We, therefore, reverse the summary dismissal of VCS but

affirm the summary dismissals of Mr. Puryear and Dr. Burns.

## FACTS[1]

VCS is a nonprofit religious school located in Spokane Valley, Washington. In

2007, Mr. Puryear, a parent of students at VCS, approached VCS about starting a football

program at the school. VCS did not have a football program because it lacked money.

To start the program, VCS relied extensively on outside donations, with Mr. Puryear's

family providing the bulk of the money. With the money, Mr. Puryear purchased

equipment and paid for team meals, transportation, referees, and emergency personnel.

Mr. Puryear served as the head coach of the football team, but he received no payment.

Mike Heden was the volunteer assistant coach. Drew played football for VCS in 2009.

In 2009, the Washington Legislature passed the Zackery Lystedt law.

RCW 28A.600.190. The purpose of the Zackery Lystedt law is to reduce the risk of

injury or death to youth athletes who suffer concussions.

---

[1] Because this case is before this court on summary judgment dismissal, the facts are recited in the light most favorable to the nonmoving party, the Swanks. *Osborn v. Mason County*, 157 Wn.2d 18, 22, 134 P.3d 197 (2006).

3

As a consequence of this new law, VCS developed a concussion information sheet (CIS). The CIS noted it was "[a]dapted from the CDC [Center for Disease Control] and the 3rd International Conference on Concussion in Sport." Clerk's Papers (CP) at 79-80. In late July 2009, VCS sent Mr. Puryear to a multi-day Washington Interscholastic Activities Association (WIAA) training program. A portion of this program discussed the new Zackery Lystedt law.

Prior to the fall 2009 football season, Mr. Puryear held a meeting with parents where he discussed the Zackery Lystedt law and distributed the CIS. The CIS defined concussion and warned that concussions could lead to serious complications, including brain damage and death. The CIS also listed several observable signs that could indicate a youth athlete might be suffering from a concussion. These signs included a dazed appearance, confusion about an assignment, and a loss of coordination. Prophetically, the CIS also provided:

### What can happen if my child keeps on playing with a concussion or returns to soon?

Athletes with the signs and symptoms of concussion should be removed from play immediately. Continuing to play with the signs and symptoms of a concussion leaves the young athlete especially vulnerable to greater injury. *There is an increased risk of significant damage from a concussion for a period of time after that concussion occurs, particularly if the athlete suffers another concussion before completely recovering from the first one. This can lead to prolonged recovery, or even to severe brain swelling*

4

> *(second impact syndrome) with devastating and even fatal consequences.* It is well known that adolescent or teenage athlete[s] will often under report symptoms of injuries. And concussions are no different. . . .

CP at 80 (emphasis added). The CIS required any athlete even suspected of suffering a concussion to be removed from the game or practice immediately, and to not return until medically cleared. The CIS also provided: "The new 'Zackery Lystedt Law' in Washington now requires the consistent and uniform implementation of long and well-established return to play concussion guidelines that have been recommended for several years." CP at 80. Finally, the CIS provided an official CDC link for current and up-to-date information on concussions. Ms. Swank and Drew signed the CIS.

On September 18, 2009, during the first game of the season, Drew took a hit and experienced a headache and neck pain. Mr. Puryear immediately removed Drew from the game. The following Monday, Drew did not go to school or attend practice because he still had a headache. On Tuesday, Ms. Swank took Drew to Dr. Burns, the Swanks' regular physician in Coeur d'Alene, Idaho. Drew told Dr. Burns he attended VCS and discussed what had happened in the game. Dr. Burns diagnosed Drew with a mild concussion, instructed him to take ibuprofen for the next few days, and prescribed the following course of treatment:

> I am also going to have [Drew] stay out of contact sports for the next three days' period of time. If he has a bad headache, after playing football, he is to be out of the sport for a week's period of time. If he has another concussion, following that, then I would have him out probably for a two-month period of time.

CP at 115. Mr. Swank told Mr. Puryear that Drew's doctor diagnosed Drew with a concussion. Drew attended practices that Tuesday, Wednesday, and Thursday, but he did not participate.

On Thursday, September 24, Drew's headaches stopped, and Ms. Swank called Dr. Burns to get a release for Drew to play in the game the next day. Ms. Swank told Dr. Burns's receptionist the following:

> I told the receptionist that he had a concussion and Dr. Burns saw him and said he couldn't play. He says his headaches are gone now, and he plays school in the State of Washington and they have a new law and before he can go back to play, he has to have a release from the doctor.

CP at 188. Later that day, Dr. Burns wrote a note clearing Drew to return to play on September 25, 2009.

Dr. Burns is an Idaho resident who practices medicine at Ironwood Family Practice, an Idaho corporation. While he was licensed in Washington starting in 1988 and completed his residency in Spokane in 1989, he has been licensed to practice medicine only in Idaho since 2003. Out of Dr. Burns's approximately 2,400 patients, one to three percent are Washington residents. Dr. Burns sends prescriptions to Washington

6

pharmacies, and Ironwood uses laboratories in Washington and contracts with Washington insurance companies. Dr. Burns first met the Swanks in Idaho in the early 1990s shortly after Dr. Burns joined Ironwood. The Swanks were Idaho residents at that time and were still Idaho residents in 2009. Dr. Burns provided all treatment to Drew in Idaho.

On Thursday, September 24, VCS and Mr. Puryear received the note clearing Drew to return to play the following day. During school on Friday, September 25, Drew appeared to be his normal self. Mr. Heden did not notice anything wrong with Drew during warmups before the game, and Drew played in the game against Washtucna. Soon after the game began, multiple people observed Drew's quality of play decline. One of Drew's teammates said, "his play grew worse and worse as the game progressed" and "Drew became sluggish during the game and was frequently out of position." CP at 402-03. Drew's aunt stated, "he wasn't the same player he was the year before. He wasn't running fast. He wasn't quick, and he was just kind of standing." CP at 526. Mr. Swank said Drew misjudged where the ball was going on kickoffs, missed blocking assignments, looked sluggish, and appeared dazed and confused. Ms. Swank said Drew's timing was off, he was not crisp and sharp when cutting, he missed tackles, and he looked confused and sluggish. Mr. Puryear was also aware Drew was playing poorly because he yelled at

Drew several times to come to the sidelines. In addition, on one occasion Mr. Puryear "grabbed Drew by the face mask and violently began to jerk it up and down hard while he screamed at him, 'What are you doing out there, what are you doing out there?'" CP at 175. At the end of the second quarter, an opposing player hit Drew. Drew shuffled off the field and collapsed. Two days later, Drew died.

In September 2012, Mr. Swank, as personal representative of the estate of his son, and individually with his wife, filed suit against VCS, its principal Derick Tabish, Mr. Puryear, Mr. Heden, and Dr. Burns. As to Mr. Puryear, the suit alleged negligence, recklessness, and violation of the Zackery Lystedt law. As to VCS, Mr. Tabish, and Mr. Heden, the suit alleged negligence and violation of the Zackery Lystedt law. As to Dr. Burns, the suit alleged medical malpractice and violation of the Zackery Lystedt law. The parties later agreed to dismiss Mr. Heden. VCS, Mr. Tabish, Mr. Puryear, and Dr. Burns moved for summary judgment. The superior court granted dismissal for all defendants, specifically noting it dismissed Dr. Burns for lack of personal jurisdiction. The Swanks appealed.[2]

---

[2] During the pendency of their appeal, the Swanks moved to dismiss their claims against Mr. Tabish with VCS's agreement that evidence of his alleged fault could be presented and imputed to VCS. This court granted the Swanks' motion.

8

LAW

A.    *Zackery Lystedt Law*

In 2009, Washington passed the Zackery Lystedt law, RCW 28A.600.190, the

country's first comprehensive concussion law for youth athletes. Josh Hunsucker, *Buckle*

*Your Chinstrap: Why Youth, High School, and College Football Should Adopt the NFL's*

*Concussion Management Policies and Procedures*, 45 MCGEORGE L. REV. 801, 814

(2014). The purpose of the Zackery Lystedt law is to reduce the risk of injury or death to

youth athletes who sustain concussions. *See* RCW 28A.600.190. The three core tenets of

the Zackery Lystedt law are: (1) to establish a set of concussion management guidelines

in order to educate coaches, parents, and youth athletes about the risks associated with

concussions, (2) to remove youth athletes from competition if they exhibit any sign or

symptom of a concussion, and (3) to require youth athletes to be cleared by a licensed

health care provider before returning to play. RCW 28A.600.190(2)-(4).

The law requires school districts to work in concert with the WIAA to develop

guidelines, pertinent information, and forms to inform and educate coaches, youth

athletes, and their parents concerning the nature and risk of concussions and head injuries,

including the heightened risk of continuing to play after suffering an initial concussion or

head injury. RCW 28A.600.190(2). Each youth athlete and the athlete's parent or

guardian must sign and return a concussion and head injury information sheet circulated by the school district before the youth athlete is allowed to participate in any sporting practice or competition. RCW 28A.600.190(2).

If a youth athlete is suspected of sustaining a concussion or head injury in a practice or game, the youth athlete must be immediately removed from play at that time. RCW 28A.600.190(3). A youth athlete who has been removed from play may not return until he receives written clearance from a properly trained licensed health care provider. RCW 28A.600.190(4).

1. *The Zackery Lystedt law does not mandate specific return to play standards*

The Swanks argue the Zackery Lystedt law requires schools and coaches to adhere to "generally recognized return to play standards" that mandate gradually returning an athlete to play after sustaining a concussion or head injury. The Swanks point to numerous publications outlining these gradual return to play standards and rely on the following language in the Zackery Lystedt law in making this argument:

> Continuing to play with a concussion or symptoms of head injury leaves the young athlete especially vulnerable to greater injury and even death. The legislature recognizes that, *despite having generally recognized return to play standards for concussion and head injury*, some affected youth athletes are prematurely returned to play resulting in actual or potential physical injury or death to youth athletes in the state of Washington.

RCW 28A.600.190(1)(c) (emphasis added).

10

"Statutory interpretation is a question of law which this court reviews de novo." *Berger v. Sonneland*, 144 Wn.2d 91, 104-05, 26 P.3d 257 (2001). Statutory interpretation is used "'to determine and give effect to the intent of the legislature.'" *State v. Reeves*, 184 Wn. App. 154, 158, 336 P.3d 105 (2014) (internal quotation marks omitted) (quoting *State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013)). But this court will not indulge in speculation about the legislature's subjective intent. *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 409, 869 P.2d 28 (1994). Thus, if the statute is plain and unambiguous, this court does not engage in statutory interpretation. *Berger*, 144 Wn.2d at 105. "A court may not add words to a statute even if it believes the [l]egislature intended something else but failed to express it adequately." *Caritas Servs.*, 123 Wn.2d at 409. Nor can a statute incorporate something by reference without ever specifically referring to that something. *See State v. Hovrud*, 60 Wn. App. 573, 576, 805 P.2d 250 (1991) (stating the court knows of no authority for the proposition that a statute incorporates other statutes by reference without ever referring to them).

Contrary to the Swanks' contention, the Zackery Lystedt law does not adopt "generally recognized return to play standards." Rather, in the Zackery Lystedt law's introductory section, the law notes—notwithstanding the presence of standards for returning athletes to play after sustaining a concussion—some athletes are still

11

prematurely returned to play. The Zackery Lystedt law does not specifically reference any return to play standard.

To the extent there is any ambiguity in what the legislature intended, the legislative history of the Zackery Lystedt law shows the legislature did not intend to adopt "generally recognized return to play standards" providing for gradual return to play. *See Reeves*, 184 Wn. App. at 158 (In resolving ambiguity, this court "resort[s] to other indicia of legislative intent, including . . . legislative history."). When proposing the initial bill to the House Education Committee, the bill's proponents stated Zackery Lystedt's injury led to the creation of the bill. Hr'g on H.B. 1824 Before the H. Educ. Comm., 60th Leg., Reg. Sess. (Wash. Feb. 13, 2009), http://www.tvw.org/watch/?eventID=2009021239 (statement of Rep. Jay Rodne) [hereinafter February House Hearing]. Thirteen-year-old Zackery Lystedt suffered a brain injury following his return to play in a football game after sustaining a concussion in that same game. Tom Wyrwich, *Special Report: The Dangers of Adolescents Playing Football with Concussions*, THE SEATTLE TIMES (Nov. 4, 2008), http://seattletimes.nwsource.com/html/highschoolsports/2008347382_concussions04.htm. Accordingly, testimony before the House Education Committee focused on removing young athletes from play if a brain injury is suspected and not returning them to play until

12

cleared by a licensed health care provider. *See generally* February House Hearing; Hr'g

on E.H.B. 1824 Before the S. Early Learning & K-12 Educ. Comm., 60th Leg., Reg. Sess.

(Wash. Mar. 18, 2009), http://www.tvw.org/watch/?eventID=2009031207. There was no

legislative testimony regarding or contemplating gradual return to play standards.[3]

2.      *The Zackery Lystedt law does not create an implied cause of action*

The Swanks seek both common law and statutory remedies. The Swanks argue

violation of the Zackery Lystedt law creates an implied statutory cause of action. While

the Zackery Lystedt law does not expressly provide a civil remedy, the Swanks contend it

implies a remedy because of the grant of immunity to volunteer health care providers, the

mandatory phrasing of the obligations imposed, and the absence of an alternative

enforcement mechanism.

---

[3] Indeed, return to play standards in 2009 were not uniform. In North America in 2010, there were "no uniform guidelines for the identification of post-concussion management of sport-related concussions for young athletes." Marie-France Wilson, *Young Athletes at Risk: Preventing and Managing Consequences of Sports Concussions in Young Athletes and the Related Legal Issues*, 21 MARQ. SPORTS L. REV. 241, 257 (2010). Even in 2014, there were at least 16 different concussion guidelines in existence. Samuel D. Hodge, Jr., *A Heads-Up on Traumatic Brain Injuries in Sports*, 17 J. HEALTH CARE L. & POL'Y 155, 166, 172 (2014) (noting these disparate guidelines lack agreement on the specific time in which an athlete may return to play).

This court will imply a statutory cause of action under a three-prong test:

[F]irst, whether the plaintiff is within the class for whose "especial" benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation.

*Bennett v. Hardy*, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990). The premise for an implied cause of action is "the assumption that the legislature would not specifically grant rights to a class of persons 'without enabling members of that class to enforce those rights.'" *Adams v. King County*, 164 Wn.2d 640, 653, 192 P.3d 891 (2008) (quoting *Bennett*, 113 Wn.2d at 921).

The first *Bennett* prong asks whether the plaintiff was within the class intended to be benefited by the statute. This question is resolved in the Swanks' favor. Drew was a youth athlete who suffered a concussion in a game. Without question, Drew was within the class who was intended to be benefited and protected by the Zackery Lystedt law.

The second *Bennett* prong require us to discern legislative intent. The Swanks' strongest argument for an implied cause of action is the legislature's grant of immunity to volunteer health care providers who evaluate the youth athlete for concussion and/or provide written clearance to return to play. *See* RCW 28A.600.190(4). The Swanks argue that the legislature would not have provided for immunity had it not intended there

14

to be liability.

The Washington Supreme Court's precedent is divided over how grants of immunity play into the intent to create an implied cause of action. In *Beggs*, the court used the grant of good faith immunity seen in RCW 26.44.030, which requires certain professionals to report suspected child abuse to the proper authorities, to find the statute implicitly supported a civil remedy. *Beggs v. Dep't of Soc. & Health Servs.*, 171 Wn.2d 69, 78, 247 P.3d 421 (2011). But in *Adams*, the court specifically rejected the appellant's argument that good faith immunity sufficed to establish legislative intent to create an implied cause of action for violations of the former Washington Uniform Anatomical Gift Act (WAGA). *Adams*, 164 Wn.2d at 656. The court noted "if the legislature had intended to provide a remedy under the WAGA, it would have expressly created the liability to which the immunity corresponds." *Id.* The court found further support for its rejection of an implied cause of action in the comment to the revised Uniform Anatomical Gift Act of 2006, which recognized that common law provides remedies if a person acts in bad faith. *Id.*

Here, as in *Adams*, the Swanks have remedies apart from implying a cause of action under the Zackery Lystedt law. The availability of remedies weighs against the third *Bennett* prong, which asks whether the legislative purpose is best achieved by

15

implying a cause of action. The Swanks have common law negligence remedies against

VCS and Mr. Puryear. They also have a medical malpractice remedy against Dr. Burns.

Because RCW 5.40.050 allows a trier of fact to consider the breach of a statutory duty as

evidence of negligence, the Swanks may bootstrap their contentions that VCS and Mr.

Puryear violated the Zackery Lystedt law into their assertions of negligence.[4] Because the

Swanks already have these remedies, we conclude that we need not imply a new cause of

action given the legislature's murky intent in this regard.

Having discussed the Zackery Lystedt law and concluded that the law neither

mandates a specific return to play standard nor gives rise to an implied cause of action,

we now address whether the trial court erred in dismissing the Swanks' claims on

summary judgment.

B. *Summary Judgment Standard and Analysis*

This court reviews summary judgment orders de novo, engaging in the same

inquiry as the trial court. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 483, 78 P.3d 1274

(2003) (quoting *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002)).

Summary judgment is appropriate only if "there is no genuine issue as to any material fact

---

[4] Neither VCS nor Mr. Puryear deny that RCW 28A.600.190 creates duties for schools and coaches. We do not answer the question of whether RCW 28A.600.190 creates a duty for licensed health care providers.

16

and [ ] the moving party is entitled to judgment as a matter of law." CR 56(c). Evidence is construed in the light most favorable to the nonmoving party. *Osborn v. Mason County*, 157 Wn.2d 18, 22, 134 P.3d 197 (2006).

1.    *Claims against VCS*

The Swanks argue VCS was negligent when it failed to (1) utilize gradual return to play standards and (2) remove Drew from the Washtucna game when he exhibited signs of a concussion. To overcome a motion for summary judgment, the Swanks must allege facts showing the existence of the four basic elements of a negligence claim: (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008) (quoting *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996)).

The first two elements are at issue here. The common law and the Zackery Lystedt law each provide VCS with duties it owes to student athletes. Under the common law, schools "owe[ ] a duty to [their] students to employ ordinary care and to anticipate reasonably foreseeable dangers so as to take precautions for protecting the children in [their] custody from such dangers." *Wagenblast v. Odessa Sch. Dist. No. 105-157-166J*, 110 Wn.2d 845, 856, 758 P.2d 968 (1988) (stating this duty extends to student athletes). As discussed previously, the Zackery Lystedt law imposes duties on schools and coaches

17

to protect youth athletes suspected of sustaining a concussion.

Although the Zackery Lystedt law does not explicitly adopt gradual return to play standards, it does explicitly require schools to work together with the WIAA "to develop guidelines and other pertinent information and forms to inform and educate coaches . . . of the nature and risk of concussion and head injury including continuing to play after concussion or head injury." RCW 28A.600.190(2). By logical extension, the Zackery Lystedt law requires schools and their coaches to protect their youth athletes by *complying* with the training they received or reasonably should have received. To the extent that Washington high school football coaches actually received or should have received concussion protocol training prior to the fall 2009 football season, this evidence is highly relevant and admissible in this case. Here, the CIS explicitly states, "Athletes with the signs and symptoms of concussion should be removed from play immediately. Continuing to play with the signs and symptoms of a concussion leaves the young athlete especially vulnerable to greater injury." CP at 80. VCS and Mr. Puryear were aware of this language because VCS participated in creating the CIS, and Mr. Puryear handed out the CIS to athletes and parents prior to the commencement of the fall 2009 football season.

18

There is a genuine issue of material fact as to whether VCS breached its duty to Drew during the Washtucna game. Although VCS argues it had a right to rely on Dr. Burns' note that Drew was fit to play, the Zackery Lystedt law does not permit VCS to ignore observable signs that Drew continued to suffer from the concussion he earlier sustained and ignore its own CIS that required VCS to remove Drew from play. Under the Zackery Lystedt law, VCS and Mr. Puryear knew that "some affected youth athletes are prematurely returned to play" "and that "[c]ontinuing to play with a concussion or symptoms of head injury leaves the young athlete especially vulnerable to greater injury and even death." RCW 28A.600.190(1)(c). With this knowledge, VCS was charged with the duty of ordinary care and protecting Drew consistent with the training Mr. Puryear received or should have received prior to the fall 2009 football season.

According to Drew's family and a teammate, Drew's performance in the Washtucna game was atypical: he was slow, uncoordinated, and missed plays he did not normally miss. These characteristics are those the CIS lists as observable characteristics of an athlete who is exhibiting signs of a concussion. Further, there is evidence that VCS, through Mr. Puryear, had knowledge of Drew's concussion-related deficits. Mr. Puryear called Drew over to the sidelines multiple times to yell at him and once even grabbed Drew by his face mask and shook it violently. With all this knowledge, together with the

19

duty of ordinary care buttressed with proper training, there is a genuine issue of material

fact whether, and at what point, Mr. Puryear should have removed Drew from the

Washtucna game. The trial court erred in granting summary judgment dismissal for VCS.

2. *Claims against Mr. Puryear*

Having concluded that VCS was improperly dismissed because issues of material

fact existed whether Mr. Puryear acted with ordinary care, we preliminarily conclude that

Mr. Puryear, as the agent of VCS, also has personal tort liability. *Eastwood v. Horse

Harbor Found., Inc.*, 170 Wn.2d 380, 400, 241 P.3d 1256 (2010). Mr. Puryear's primary

defense to personal liability is the nonprofit volunteer immunity statute, RCW 4.24.670.

a. *Nonprofit volunteer immunity*

RCW 4.24.670 provides in relevant part:

> (1) [A] volunteer of a nonprofit organization . . . shall not be
> personally liable for harm caused by an act or omission of the volunteer on
> behalf of the organization or entity if:
> . . . .
> (c) The harm was not caused by willful or criminal misconduct,
> gross negligence, reckless misconduct, or a conscious, flagrant indifference
> to the rights or safety of the individual harmed by the volunteer.

The statute further defines "volunteer" as

> an individual performing services for a nonprofit organization . . . who does
> not receive compensation, other than reasonable reimbursement or
> allowance for expenses actually incurred, or any other thing of value, in
> excess of five hundred dollars per year. "Volunteer" includes a volunteer

20

serving as a director, officer, trustee, or direct service volunteer.

RCW 4.24.670(5)(e).

The Swanks do not dispute that VCS is a nonprofit organization. The Swanks argue: (1) Mr. Puryear was not a "volunteer" because he was not an individual, but instead entered into a joint venture with VCS, and (2) Mr. Puryear acted with gross negligence or acted recklessly when he grabbed Drew by the face mask and shook it.

i.      *Joint venture rebuttal to volunteer immunity*

An individual can participate in an endeavor in many legal capacities. For instance, an individual can be an employee and hence an agent of a principal, an individual can be an independent contractor, or an individual can be a partner. The legal capacity in which the individual participates in an endeavor does not change the fact that the individual still is an individual. Even if we were to conclude that Mr. Puryear entered into a joint venture with VCS, this does not detract from the fact that he did so as an individual. We conclude that Mr. Puryear was an individual and subject to the immunity of RCW 4.24.670.

21

ii.     *Gross negligence/recklessness rebuttal to volunteer immunity*

In footnote 88 of their opening brief, the Swanks obliquely argue Mr. Puryear does not have volunteer immunity for grabbing Drew by the face mask and shaking it because such conduct amounts to gross negligence or recklessness.[5] Mr. Puryear's response to the Swanks' footnoted argument is that the face mask claim is one for battery and is barred by RCW 4.16.100(1), the two-year statute of limitations.

The factual allegations of the complaint determine the applicable statute of limitations. *Boyles v. City of Kennewick*, 62 Wn. App. 174, 177, 813 P.2d 178 (1991). A plaintiff cannot avoid the battery limitation period "by disguising the real cause of action in a different form." *Id.* The Swanks alleged the following facts in their complaint:

2.7     As a result of Andrew's uncharacteristically poor play, Defendant Mr. Puryear called Andrew to the sidelines, grabbed him by the facemask and proceeded to violently shake his head up and down in anger. To the best information, knowledge, and belief of Plaintiffs, the violent shaking of Andrew's head caused and/or contributed to the second impact syndrome that resulted in Andrew's death.

CP at 4.

These factual allegations are consistent with battery. A battery is "an intentional and unpermitted contact with the plaintiff's person." *Kumar v. Gate Gourmet, Inc.*, 180

---

[5] The Swanks do not argue that Mr. Puryear's failure to remove Drew from the Washtukna game amounted to gross negligence. Our analysis of this issue therefore is

Wn.2d 481, 504, 325 P.3d 193 (2014). A defendant is liable for battery if he intends to cause a harmful or offensive contact with the plaintiff and such a contact results. *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 13 (1965)). It is not necessary that the defendant intended the specific harm that befell the plaintiff; it is the conduct that must be intended, not the result. *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 866, 324 P.3d 763 (2014).

The Swanks' complaint and depositions show this shaking of Drew's face mask was harmful and/or offensive. The words used in the complaint demonstrate this was a harmful contact, alleging it led to second impact syndrome. In his deposition, Mr. Swank states the contact was offensive to him. By reaching out to grab and shake Drew's face mask, Mr. Puryear obviously intended to make the harmful or offensive contact. Thus, this claim is properly characterized as one for battery and is barred by the two-year statute of limitations.

In summary, we conclude that Mr. Puryear was an individual for purposes of RCW 4.24.670(5)(e) and therefore protected by the nonprofit volunteer immunity statute. We further conclude that the two-year statute of limitations shields Mr. Puryear from potential liability for the face mask claim. The trial court did not err in granting summary

limited to the face mask shaking claim.

23

judgment dismissal in favor of Mr. Puryear.

3.     *Claims against Dr. Burns*

The Swanks contend the court erred in dismissing their claims against Dr. Burns for lack of personal jurisdiction. In a summary judgment context, the party asserting personal jurisdiction, here the Swanks, bears the burden of presenting a prima facie case establishing jurisdiction. *Shaffer v. McFadden*, 125 Wn. App. 364, 370, 104 P.3d 742 (2005). This court treats the allegations in the complaint as true in determining whether the Swanks have met their burden. *Id.*

The Swanks first assert the Zackery Lystedt law creates an implied cause of action that is not preempted by the medical negligence statute, chapter 7.70 RCW. They next contend Washington has personal jurisdiction over Dr. Burns because Dr. Burns knew Drew could suffer injury or death in Washington if he was cleared to return to play too soon.

a.     *The Zackery Lystedt law does not create an implied cause of action*

We previously analyzed whether the Zackery Lystedt law created an implied cause of action. We held the Zackery Lystedt law did not create an implied cause of action. Therefore, the Swanks' only viable cause of action against Dr. Burns is one for medical negligence.

24

b.      *No personal jurisdiction*[6]

The Swanks argue that Washington has personal jurisdiction over Dr. Burns because Dr. Burns cleared Drew to return to play football in Washington. "It is well established in Washington 'that under the long-arm statute, RCW 4.28.185, our courts may assert jurisdiction over nonresident individuals and foreign corporations to the extent permitted by the due process clause of the United States Constitution, except as limited by the terms of the statute.'" *Shute v. Carnival Cruise Lines*, 113 Wn.2d 763, 766-67, 783 P.2d 78 (1989) (quoting *Deutsch v. W. Coast Mach. Co.*, 80 Wn.2d 707, 711, 497 P.2d 1311 (1972)). "Our long-arm statute is patterned after the Illinois statute," which "'reflects on the part of the [Illinois] legislature a conscious purpose to assert jurisdiction over nonresident defendants to the extent permitted by the due-process clause.'" *Id.* at 767 (internal quotation marks omitted) (quoting *Tyee Constr. Co. v. Dulien Steel Prods., Inc.*, 62 Wn.2d 106, 109, 381 P.2d 245 (1963)). So RCW 4.28.185 should be interpreted broadly consistent with this purpose. *Shute*, 113 Wn.2d at 767.

---

[6] In their facts section of their opening brief, the Swanks set forth numerous contacts that Dr. Burns and/or his practice group had with the state of Washington. Yet, in the argument section of their opening brief, the Swanks limit their general jurisdiction argument to the second paragraph of footnote 91. We decline to consider the Swanks' argument that Washington has general jurisdiction over Dr. Burns because the Swanks have not meaningfully briefed this issue. *Ameriquest Mortg. Co. v. Att'y Gen.*, 148 Wn. App. 145, 166, 199 P.3d 468 (2009).

RCW 4.28.185(1) provides in relevant part:

Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person . . . to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:

. . . .

(b)     The commission of a tortious act within this state.

The dispositive case is *Lewis v. Bours*, 119 Wn.2d 667, 835 P.2d 221 (1992). As recognized in *Lewis*, Washington generally follows the rule that "when an injury occurs in Washington, it is an inseparable part of the 'tortious act' and that act is deemed to have occurred in this state for purposes of the long-arm statute." *Id.* at 670 (internal quotation marks omitted). But the *Lewis* court deviated from this general rule. In *Lewis*, Jeanne Lewis, a Washington resident, went to Oregon to receive prenatal care at Dr. Peter Bours's clinic. *Id.* at 668. Ms. Lewis gave birth to a baby girl at the clinic in Oregon, and Dr. Bours released them with instructions to see a doctor upon returning to Washington. *Id.* at 668-69. The baby suffered severe complications during the return drive home. *Id.* at 669. Ms. Lewis sued Dr. Bours, alleging he committed a tort in Washington under the long-arm statute because the injury manifested itself in Washington. *Id.* In rejecting Ms. Lewis's argument, the court was persuaded by an Illinois decision. That decision reasoned that the place of injury for a professional malpractice action is the state where the professional service was performed, even if the injury later manifested itself in the

26

forum state. *Id.* at 671-73. The *Lewis* court held:

> We thus align ourselves with the Illinois Supreme Court and hereby create an exception to the general rule that the place of the tort is the where the injury occurs. In the event that a nonresident professional commits malpractice in another state against a Washington State resident, that, standing alone, does not constitute a tortious act committed in this state regardless of whether the Washington State resident suffered injury upon his or her return to Washington.

*Id.* at 673.

Like in *Lewis*, the Swanks unilaterally sought Dr. Burns's professional services in Idaho. All care, negligent and/or otherwise, was rendered in Idaho. Dr. Burns was not a part of any care Drew may have received in Washington. Dr. Burns may have known Drew played football in Washington, but as *Lewis* holds, knowledge that a patient will go to Washington and foreseeably suffer injury in this state is insufficient to create personal jurisdiction.[7]

There are also public policy reasons supporting Dr. Burns's dismissal for lack of personal jurisdiction. The exception carved out in *Lewis* is based on the personal nature

---

[7] The Swanks emphasize the phrase "standing alone" within the above-quoted holding in *Lewis*. They argue the contacts Dr. Burns and/or his clinic has with Washington takes the present case outside of *Lewis*. The Swanks are potentially correct. Had they adequately argued general jurisdiction, *Lewis* might be distinguishable. But they did not adequately argue general jurisdiction in their opening brief. Nor did they respond to Dr. Burns's numerous counter-arguments on the issue of general jurisdiction in their reply brief.

of rendering services as opposed to the sale of goods: "the location where the services are performed is of greater jurisdictional importance than is the location where a product is bought." *Grange Ins. Ass'n v. State*, 110 Wn.2d 752, 763, 757 P.2d 933 (1988). It is a national public policy to ensure medical services are available to all people. *Id.* If physicians have to worry about defending malpractice suits in foreign jurisdictions, this policy might be inhibited. *Id.* Along similar lines,

> "In the case of personal services focus must be on the place where the services are rendered, since this is the place of the receiver's (here the patient's) need. The need is personal and the services rendered are in response to the dimensions of that personal need. *They are directed to no place but to the needy person herself. It is in the very nature of such services that their consequences will be felt wherever the person may choose to go.* However, the idea that tortious rendition of such services is a portable tort which can be deemed to have been committed wherever the consequences foreseeably were felt is wholly inconsistent with the public interest in having services of this sort generally available. Medical services in particular should not be proscribed by the doctor's concerns as to where the patient may carry the consequences of his treatment and in what distant lands he may be called upon to defend it."

*Hogan v. Johnson*, 39 Wn. App. 96, 102-03, 692 P.2d 198 (1984) (quoting *Wright v. Yackley*, 459 F.2d 287, 289-90 (9th Cir. 1972)) (emphasis added).

*Lewis* controls. We conclude Washington does not have personal jurisdiction over Dr. Burns as to the tortious cause of action asserted here. The trial court properly dismissed Dr. Burns for lack of personal jurisdiction.

28

No. 33782-1-III
*Swank v. Valley Christian Sch.*

Based on the foregoing, we affirm the dismissals of Mr. Puryear and Dr. Burns.

We reverse the dismissal of VCS. This matter is remanded to the superior court for

proceedings consistent with this opinion.

Lawrence-Berrey, J.

WE CONCUR:

Fearing, C.J.

Korsmo, J.

29