

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUL 0 6 2017

CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on July 6, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| DONALD R. SWANK, individually and as personal representative of THE ESTATE OF ANDREW F. SWANK, and PATRICIA A. SWANK, individually, <br><br> Petitioners, <br><br> v. <br><br> VALLEY CHRISTIAN SCHOOL, a Washington State non-profit corporation, JIM PURYEAR, individually, and TIMOTHY F. BURNS, M.D., individually, <br><br> Respondents, <br><br> MIKE HEDEN and DERICK TABISH, individually, <br><br> Defendants. | No. 93282-4 <br><br> En Banc <br><br> Filed JUL 0 6 2017 |

WIGGINS, J.—Andrew Swank (Drew) died from complications after contact with another player during a high school football game. Drew's parents sued Drew's school, the football coach, and Drew's doctor on behalf of his estate and individually. The trial court granted summary judgment against the Swanks on all claims, and the Court of Appeals affirmed.

We must decide whether Washington's Zackery Lystedt Law (Lystedt law), RCW 28A.600.190, gives rise to an implied cause of action. We hold that an implied cause of action does arise from the Lystedt law. As a result, the Swanks' claims that Valley Christian School (VCS) and Jim Puryear (Coach Puryear) violated the Lystedt law may proceed. We also hold that the evidence against the coach was sufficient to permit a jury to find liability against the coach, despite the limited volunteer immunity protecting the coach. Consequently, we reinstate the Swanks' common law negligence claims against the coach. Finally, we hold that the trial court lacked personal jurisdiction over Drew's doctor. Accordingly, we reverse in part and affirm in part.

## FACTS[1]

I.    Factual History

VCS is a nonprofit religious school located in Spokane Valley, Washington. In 2007, Jim Puryear, a parent of students attending VCS, approached the school and offered to start a school football team. The school agreed, and Puryear began to coach VCS's football team. Coach Puryear was not compensated for his coaching, and he funded most, if not all, of the program, buying equipment, paying for referees and emergency medical services at games, and funding the team's travel. Drew played football for VCS in 2009.

---

[1] Since this case is a review of a grant of summary judgment, "we consider all facts and make all reasonable factual inferences in the light most favorable to the nonmoving party," here, the Swanks. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). As a result, the following facts are presented according to the Swanks' description of events.

In 2009, the legislature passed the Lystedt law, RCW 28A.600.190. The purpose of the Lystedt law is to reduce the risk of further injury or death to youth athletes who suffer concussions in the state of Washington. *See* RCW 28A.600.190. The law requires schools to develop a concussion and head injury information sheet to "inform and educate coaches, youth athletes, and their parents and/or guardians of the nature and risk of concussion and head injury including continuing to play after concussion or head injury." RCW 28A.600.190(2). The Lystedt law also requires youth athletes to be removed from play immediately when they are suspected of sustaining a concussion or head injury. RCW 28A.600.190(3). A youth athlete who is removed from play may not return until he or she is evaluated by and receives written clearance from a licensed health care provider. RCW 28A.600.190(4).

Pursuant to the Lystedt law, VCS developed a concussion information sheet (CIS). The CIS defined "concussion," listed the symptoms of a concussion, and warned of the consequences of a concussion, including serious injury and death, which can result when an athlete with a concussion returns to play too soon. The CIS also instructed that athletes suspected of having a concussion "should be removed from the game or practice immediately," and that such athletes may not return to play without receiving medical clearance. Prior to the start of the 2009 season, Coach Puryear had a meeting with the football athletes and their parents to discuss and distribute the CIS, which both Drew and his mother signed.

On September 18, 2009, Drew was hit hard on the head during a football game. After the injury, he was removed from the game. Drew reported having neck pain and headaches. Three days after he was injured, Drew's mother took him to see Dr. Timothy

3

Burns, who has been the Swanks' primary care physician ever since Drew was born. The Swanks are residents of Idaho, and Dr. Burns, a licensed doctor in Idaho, has a doctor's office located in Coeur d'Alene, Idaho. Dr. Burns examined Drew in Idaho and told him and his mother that Drew should be kept out of contact sports for the next three days. He prescribed ibuprofen and told Drew and his mother that if Drew experienced headaches after playing football, he would need to stay out of contact sports for a week.

Two days later, Drew's mother called Dr. Burns's office and told a nurse that Drew's headaches had stopped. Drew's mother asked that Dr. Burns write and sign a release because Drew played football in Washington State and Washington had a new law requiring a note from a doctor before Drew could return to practice. Later that day, Dr. Burns wrote a note releasing Drew to play football, which Drew's mother picked up from the Idaho office. Drew's father gave a copy of the medical release to Coach Puryear or the athletic director.

The following day, Drew played in a football game. Although Drew initially played well, his quality of play sharply declined during the game. Drew appeared "sluggish," confused, and slow to respond. Drew's father stated that he thought the coaches "clearly missed the fact that Drew was playing so far below his normal level." He recalled Drew's uncharacteristically poor play on kickoff returns and Coach Puryear yelling at Drew from the sidelines in apparent frustration over Drew's missed plays. Drew's former teammate described the events in his affidavit:

> Drew Swank started out the game playing like his normal self but his play grew worse and worse as the game progressed. This was evidenced by the fact that the coaches were yelling at Drew frequently during the game, especially about his positioning. Drew was one of the better players on

4

the team and it was uncommon for the coaches to be yelling at him. Drew became sluggish during the game and was frequently out of position.

Drew's aunt said that she observed from the sidelines that "[Drew] wasn't the same player he was the year before. He wasn't running fast. He wasn't quick, and he was just kind of standing." She also recalled Drew's mother commenting to her after Drew's apparent confusion on a kickoff play, "[Drew is] confused. He doesn't know, what is wrong? He's not listening. Why isn't he listening?"

During the game, Coach Puryear called Drew over to the sidelines, where he grabbed Drew's face mask and, according to Drew's father, "began to jerk it up and down hard while he screamed at [Drew], 'What are you doing out there, what are you doing out there?'" Drew returned to the game, where he was hit by an opposing player. He suffered head injuries and staggered to the sideline, where he collapsed. Drew died two days later.

II.    Procedural History

Three years after Drew's death, his parents[2] filed suit against VCS, Coach Puryear, and Dr. Burns.[3] The Swanks brought common law negligence claims and claimed that the parties violated the Lystedt law. VCS, Coach Puryear, and Dr. Burns moved for summary judgment, which the trial court granted. The Swanks appealed.

The Court of Appeals affirmed the trial court's grants of summary judgment on all but the general negligence claim against VCS. *See Swank v. Valley Christian Sch.*,

---

[2] Drew's father filed individually and as the representative of Drew's estate.

[3] The Swanks also filed suit against assistant coach Mike Heden and school principal Derick Tabish. They are no longer parties to the suit.

194 Wn. App. 67, 374 P.3d 245 (2016). The Court of Appeals held that (1) the Lystedt law did not create an implied statutory cause of action, (2) Coach Puryear was entitled to volunteer immunity, (3) the Swanks' claim pertaining to Coach Puryear's jerking of Drew's face mask (the face mask claim) was a claim for battery that is barred by the two-year statute of limitations for battery, and (4) the trial court lacked personal jurisdiction over Dr. Burns. *Id.* at 86-91. The Swanks then petitioned this court for review, which we granted. VCS did not petition for review of the Court of Appeals' decision to remand the general negligence claim against it, and we do not address that claim in this opinion.

## STANDARD OF REVIEW

"We review a trial court's grant of summary judgment de novo." *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). "Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.*; *see* CR 56(c).

## ANALYSIS

We reverse in part and affirm in part. First, we hold that the Lystedt law includes an implied cause of action and reverse the grant of summary judgment on this point. As a result, we reinstate the Swanks' claims that VCS and Coach Puryear violated the Lystedt law. Second, we hold that summary judgment on the claims against Coach Puryear was erroneous and reverse the grant of summary judgment on this point. Consequently, the Swanks' common law negligence claims against Coach Puryear are reinstated for further proceedings in superior court. Finally, we hold that the trial court

lacked personal jurisdiction over Dr. Burns and affirm the grant of summary judgment for the claims against him.

I.  Implied Cause of Action

We hold that the Lystedt law includes an implied cause of action because, as discussed below, the Lystedt law satisfies all the factors of the *Bennett*[4] test.

A. *The Lystedt Law*

In 2009, the Washington Legislature passed the Lystedt law,[5] "the nation's first comprehensive concussion law." Josh Hunsucker, *Buckle Your Chinstrap: Why Youth, High School and College Football Should Adopt the NFL's Concussion Management Policies and Procedures*, 45 MCGEORGE L. REV. 801, 814 (2014). The Lystedt law's purpose is to reduce the risk of injury or death to youth athletes who suffer concussions by preventing them from returning to play too soon. RCW 28A.600.190. The three main requirements of the law are as follows.

Subsection (2) of the Lystedt law requires school districts to educate coaches, youth athletes, and the athletes' parents about the risk of concussions with a "concussion and head information sheet." The statute provides:

> Each school district's board of directors shall work in concert with the Washington interscholastic activities association to develop the guidelines and other pertinent information and forms to inform and educate coaches, youth athletes, and their parents and/or guardians of the nature and risk

---

[4] *Bennett v. Hardy*, 113 Wn.2d 912, 784 P.2d 1258 (1990).

[5] Zackery Lystedt suffered a brain injury in 2006 after he returned to play in a middle school football game with a concussion. *Find out more about Zackery Lystedt Law* (Aug. 29, 2015), http://www.nfl.com/news/story/0ap2000000339066/article/find-out-more-about-zackery-lystedt-law [https://perma.cc/wnx6-u24w]. Lystedt, his family, and several other groups "lobbied the Washington state legislature for a law to protect young athletes in all sports from returning to play too soon." *Id.*

of concussion and head injury including continuing to play after concussion or head injury. On a yearly basis, a concussion and head injury information sheet shall be signed and returned by the youth athlete and the athlete's parent and/or guardian prior to the youth athlete's initiating practice or competition.

RCW 28A.600.190(2). Every year before a youth athlete starts play, he or she and his or her parents must sign and return the concussion and head injury information sheet.

Subsection (3) of the Lystedt law requires that youth athletes be removed from practices or games when they exhibit signs of a concussion. "A youth athlete who is suspected of sustaining a concussion or head injury in a practice or game shall be removed from competition at that time." RCW 28A.600.190(3). Thus, when a youth athlete is suspected of sustaining a concussion or head injury, he or she must be removed from play immediately.

Finally, subsection (4) of the Lystedt law requires clearance from a licensed health care provider before a youth athlete returns to play. "A youth athlete who has been removed from play may not return to play until the athlete is evaluated by a licensed health care provider trained in the evaluation and management of concussion and receives written clearance to return to play from that health care provider." RCW 28A.600.190(4). No student who has been removed from play on suspicion of a concussion or head injury may return to play without medical clearance.

If these requirements are not followed, the Swanks argue that the Lystedt law includes an implied cause of action granting individuals[6] harmed by the noncompliance a right to sue. We agree with the Swanks for the following reasons.

### B. The Bennett *Test for Implied Causes of Action*

This court created a test for determining whether a statute includes an implied cause of action in *Bennett*, 113 Wn.2d 912. The plaintiffs in *Bennett* sued their employer for age discrimination under RCW 49.44.090. *Id.* at 915. While that statute made age discrimination an unfair employment practice, it did not create a remedy. *Id.* The plaintiffs argued that they should be able to recover from their employer via an implied cause of action. *Id.*

To determine whether the statute contained an implied cause of action, the court adapted a federal approach, creating a new three-part test: "first, whether the plaintiff is within the class for whose 'especial' benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation." *Id.* at 920-21 (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 823 F.2d 1349, 1353 (9th Cir. 1987)). In creating this test, the court reasoned that

> "we can assume that the legislature is aware of the doctrine of implied statutory causes of action and also assume that the legislature would not enact a remedial statute granting rights to an identifiable class without

---

[6] At oral argument, Dr. Burns argued for the first time that the Lystedt law does not apply to private school students. "[A]n appellate court generally will not consider an issue raised for the first time during oral argument where there is no argument presented on the issue and no citation to authority provided." *State v. Olson*, 126 Wn.2d 315, 319-20, 893 P.2d 629 (1995). Here, the parties did not brief this argument, which was raised for the first time at oral argument. As a result, we decline to address it.

enabling members of that class to enforce those rights. Without an implicit creation of a remedy, the statute is meaningless."

*Id.* at 919-20 (quoting *McNeal v. Allen*, 95 Wn.2d 265, 277, 621 P.2d 1285 (1980) (Brachtenbach, J., dissenting)).

Since *Bennett*, the court has used the three-part test in several cases when determining whether a statute creates an implied cause of action. *See, e.g., Kim v. Lakeside Adult Family Home*, 185 Wn.2d 532, 374 P.3d 121 (2016) (finding an implied cause of action in the abuse of vulnerable adults act, ch. 74.34 RCW); *Beggs v. State*, 171 Wn.2d 69, 247 P.3d 421 (2011) (finding an implied cause of action against persons required to report child abuse in RCW 26.44.030); *Tyner v. Dep't of Soc.& Health Servs.*, 141 Wn.2d 68, 1 P.3d 1148 (2000) (finding that parents have an implied cause of action against the state under RCW 26.44.050). *Contra Roe v. TeleTech Customer Care Mgmt. (Colo.) LLC*, 171 Wn.2d 736, 257 P.3d 586 (2011) (declining to find a cause of action in the Washington State Medical Use of Marijuana Act, former ch. 69.51A RCW (2010)); *Adams v. King County*, 164 Wn.2d 640, 192 P.3d 891 (2008) (declining to find a cause of action in the former Washington Uniform Anatomical Gift Act, RCW 68.50.520-.620), *recodified at* ch. 68.64 RCW. The three *Bennett* factors persuade us that the Lystedt law gives rise to implied causes of action.

1. Protected Class

"We look to the language of the statute to ascertain whether the plaintiff is a member of the protected class." *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 475, 951 P.2d 749 (1998). In the present case, there is no dispute that Drew was a member of the class for whose special benefit the Lystedt law was enacted: youth

athletes who sustain concussions or head injuries. *See* RCW 28A.600.190(1)(a), (3), (4) (discussing "children and adolescents who participate in sports and recreational activities" and "youth athlete[s]" with concussive injuries). Drew was a youth athlete who sustained a concussion while playing in a football game. We can "'assume that the legislature would not enact a remedial statute granting rights to an identifiable class without enabling members of that class to enforce those rights.'" *Bennett*, 113 Wn.2d at 919-20 (quoting *McNeal*, 95 Wn.2d at 277 (Brachtenbach, J., dissenting)). The first factor of the *Bennett* test weighs in favor of implying a cause of action.

### 2. Legislative Intent

The second factor of the *Bennett* test requires us to consider whether the legislature intended to grant a right of recovery for statutory violations. When examining legislative intent, we "can assume that the legislature is aware of the doctrine of implied statutory causes of action." *Id.*

The legislative concern with youth athlete concussions is clear in the Lystedt law. The legislature recognized that concussions are "one of the most commonly reported injuries" for youth athletes, and that "[t]he risk of catastrophic injuries or death [is] significant when a concussion or head injury is not properly evaluated and managed." RCW 28A.600.190(1)(a). The legislature went on to recognize "that, despite having generally recognized return to play standards for concussion and head injury, some affected youth athletes are prematurely returned to play resulting in actual or potential physical injury or death to youth athletes in the state of Washington." RCW 28A.600.190(1)(c). Despite this clear concern, there is no mechanism in the Lystedt

11

law to enforce the requirements intended to address the risks of youth athlete concussions. Given the clear legislative concern, it is logical to infer that the legislature intended that there be some sort of enforcement mechanism.

In fact, the legislature appears to have contemplated the possibility of civil liability under the Lystedt law since it exempts volunteer health care providers from liability. "A volunteer who authorizes a youth athlete to return to play is not liable for civil damages resulting from any act or omission in the rendering of such care, other than acts or omissions constituting gross negligence or willful or wanton misconduct." RCW 28A.600.190(4). This is not a grant of complete immunity, but of limited immunity. A partial immunity recognizes the need for protection against liability, but simultaneously recognizes that the immunity should be limited. By implication, the grant of immunity is evidence of the legislature's intent to imply a cause of action. *See Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 141 Wn. App. 407, 422-23, 167 P.3d 1193 (2007), *review denied*, 164 Wn.2d 1009, 195 P.3d 87 (2008).

This court has interpreted a grant of immunity in other statutes as evidence of implicit legislative intent to create a remedy. *See Beggs*, 171 Wn.2d at 78 ("'A grant of immunity from liability clearly implies that civil liability can exist in the first place.'" (quoting *Jane Doe*, 141 Wn. App. at 422-23)). In *Adams*, however, this court declined to interpret a grant of immunity as evidence of legislative intent to create a remedy. *See Adams*, 164 Wn.2d at 656. Relying heavily on *Adams*, the Court of Appeals concluded that there was no implied cause of action in the Lystedt law. *See Swank*, 194 Wn. App. at 81-82 (reasoning that "in *Adams*, the court specifically rejected the appellant's argument that good faith immunity sufficed to establish legislative intent to create an

12

implied cause of action for violations" of the Washington Uniform Anatomical Gift Act (former RCW 68.50.520-.630, *repealed by* LAWS OF 2008, ch. 139, § 31)).

However, the Court of Appeals incorrectly interpreted our language in *Adams*. In *Adams*, we relied on the history of the Uniform Anatomical Gift Act (UAGA) in declining to interpret the grant of immunity in the Washington Uniform Anatomical Gift Act (WAGA) as evidence of legislative intent to create a cause of action. WAGA was based on the UAGA. UAGA, 8A U.L.A. 62 (2014); 8A U.L.A. 84 (2014). The comment to the revised UAGA of 2006 recognizes that "if a person acts in subjective 'bad faith,' the common law provides remedies." UAGA § 18 cmt., 8A U.L.A. 164 (2014). Since the UAGA did not imply a private cause of action, Washington's adoption of the WAGA did not imply the existence of any cause of action either. *Adams*, 164 Wn.2d at 656 ("[T]he comment to the revised UAGA of 2006 recognizes that 'if a person acts in subjective "bad faith," the common law provides remedies.' In this case, Adams has raised several common law claims against Respondents for the failure to obtain her consent." (citation omitted) (quoting UAGA § 18 cmt., 8A U.L.A. 70 (Supp. 2008))). Common law remained the sole route to recovery.

Here, there is no legislative history referencing the common law remedies available to those aggrieved by a violation of the Lystedt law. Therefore, unlike *Adams*, the existence of alternative common law remedies does not answer the question of whether the legislature intended to imply a cause of action in the Lystedt law, nor does it negate the implicit legislative intent to create a remedy found in the statute. The second factor of the *Bennett* test also weighs in favor of implying a cause of action.

### 3. Underlying Purpose

The final *Bennett* factor[7] requires the court to consider if implying a cause of action is consistent with the purpose of the statute.[8] One of the major purposes of tort law is to encourage people to act with reasonable care for the welfare of themselves and others. *See, e.g., Davis v. Baugh Indus. Contractors, Inc.*, 159 Wn.2d 413, 420, 150 P.3d 545 (2007) (concluding that "'[a]n underlying purpose of tort law is to provide for public safety'" (quoting *Johnson v. Equip. Specialists, Inc.*, 58 Ill. App. 3d 133, 373 N.E.2d 837, 843, 15 Ill. Dec 491 (1978))); *see also Stuart v. Coldwell Banker Commercial Grp., Inc.*, 109 Wn.2d 406, 418-19, 745 P.2d 1284 (1987) ("As a matter of public policy, it is entirely reasonable to expect manufacturers of goods for sale to the general public to assume responsibility for the safety of their product."). The purpose of the Lystedt law is to prevent further injury or death to youth athletes suffering from concussions and head injuries. RCW 28A.600.190. Implying a cause of action is consistent with the Lystedt law's purpose because these injuries may be effectively prevented. A cause of action encourages people to act with

---

[7] The Court of Appeals misstated the third factor of the *Bennett* test as "whether the legislative purpose is *best achieved* by implying a cause of action." *Swank*, 194 Wn. App. at 82 (emphasis added). The third factor does not require the court to conclude that implying a cause of action *best achieves* the legislative purpose of a statute. Rather, the third factor asks merely whether implying a cause of action would be "consistent with the underlying purpose of the legislation." *Bennett*, 113 Wn.2d at 921.

[8] Dr. Burns appears to argue that we are prevented from implying a cause of action where a statute's title fails to reference a cause of action. Here, the act's title is, "A[n] A[ct] [r]elating to requiring the adoption of policies for the management of concussion and head injury in youth sports; amending RCW 4.24.660; and adding a new section to chapter 28A.600 RCW." LAWS OF 2009, ch. 475. While Dr. Burns is correct that an act's title defines the scope of what a statute may include, a title does not preclude finding an implied cause of action when the action falls within the title's scope. Here, we are unconvinced that the implied cause of action exceeds the scope of the statute's title. As a result, the title does not preclude us from finding an implied cause of action in the Lystedt law.

due care for the welfare of youth athletes and gives youth athletes recourse when they suffer injury or death due to improper management of their concussions. *See Kim*, 185 Wn.2d at 546 ("Implying a cause of action for failing to report suspected abuse or neglect is consistent with the legislature's intent to ensure that [government agencies] and law enforcement investigate cases of suspected abuse, and are able to provide protective services to abused vulnerable adults."). The third factor of the *Bennett* test weighs in favor of implying a cause of action. Since all three factors of the *Bennett* test are satisfied, we hold that the Lystedt law implies a cause of action.

### C. Duties Enforced by the Lystedt Law's Implied Cause of Action

There is an implied cause of action in the Lystedt law, and the requirements in subsections (2), (3), and (4) include three duties that can support a claim.[9] First, the school district must create and distribute a concussion and head injury information sheet on a yearly basis that is then signed by a youth athlete and his or her parent or guardian and returned. RCW 28A.600.190(2). Second, a youth athlete must be removed from play immediately when he or she is suspected of suffering from a concussion or head injury. RCW 28A.600.190(3). Third, a youth athlete may not return to play until he or she is examined by and receives written clearance from a licensed health care provider. RCW 28A.600.190(4). Parties may enforce these three duties through an implied cause of action.

Finding an implied cause of action in the Lystedt law gives its mandatory provisions mandatory effect. "[W]e can assume that the legislature is aware of the

---

[9] In addition to these three duties, the Swanks argued before the Court of Appeals that the Lystedt law established "'generally recognized return to play standards'" for youth athletes after

15

doctrine of implied statutory causes of action and also assume that the legislature would not enact a remedial statute granting rights to an identifiable class without enabling members of that class to enforce those rights." *Bennett*, 113 Wn.2d at 919-20 (quoting *McNeal*, 95 Wn.2d at 277 (Brachtenbach, J., dissenting)). Therefore, having concluded that the Lystedt law includes an implied cause of action, we reverse the grant of summary judgment on this point. As a result, the Swanks' claims that VCS and Coach Puryear violated the Lystedt law may proceed.

## II.   The Claims against Coach Puryear

We hold that the trial court erred in granting summary judgment on the statutory and common law claims against Coach Puryear. The Lystedt law's implied cause of action applies to coaches. Coach Puryear is a volunteer and thus is not liable for acts of simple negligence. However, he remains liable for acts that constitute gross negligence or recklessness. *See* RCW 4.24.670(1)(c). Here, the Swanks presented evidence tending to show that Coach Puryear acted with gross negligence or recklessness. Thus, genuine issues of material fact preclude summary judgment.

---

they suffer a concussion or head injury. *Swank*, 194 Wn. App. at 79-80 (quoting RCW 28A.600.190(1)(c)). The Court of Appeals disagreed, concluding that the law did not adopt a specific return to play standard. *Id.* at 79. We agree with the Court of Appeals; the Lystedt law does not mandate a specific, gradual return to play standard. *See* RCW 28A.600.190(1)(c) (recognizing "that, despite having generally recognized return to play standards," youth athletes still suffer further injury and death); *see also* H.B. REP. ON H.B. 1824, at 2, 61st Leg., Reg. Sess. (Wash. 2009) (listing the three requirements of the Lystedt law with no mention of adopting gradual return to play standards); Hr'g on H.B. 1824 Before the H. Educ. Comm., 61st Leg., Reg. Sess. (Wash. Feb. 13, 2009), *recording by* TVW, Washington State's Public Affairs Network, at 0 min., 0 sec. to 58 min., 30 sec., http://www.tvw.org/watch/ ?eventID=2009021238 (legislative testimony focusing on the importance of removing a youth athlete from play and an injured athlete's evaluation by and clearance to return to play from a licensed medical professional).

### A. Implied Cause of Action

As discussed above, we conclude that the Lystedt law includes an implied cause of action relevant to football coaches. The law requires that players "suspected of sustaining a concussion or head injury in a practice or game" be removed from play immediately. RCW 28A.600.190(3). Thus, coaches must monitor student athletes for signs of a concussion and remove athletes from play when signs of concussion manifest. Coach Puryear himself acknowledged this obligation, describing his responsibility under the Lystedt law as follows:

> [I]f I even suspected they could maybe possibly have a concussion, I mean, if there was anything that gave me any reason to believe there was even a possibility of a concussion, that they needed, that they were to be removed from play . . . .

> [W]hat it boiled down to . . . was if I even suspected there was a possibility, then I needed to take care of it.

In their complaint, the Swanks asserted that Coach Puryear failed to monitor Drew and further failed to remove Drew from the game after he showed signs consistent with a concussion. These claims directly implicate the Lystedt law's implied cause of action.

### B. Volunteer Immunity

While the Swanks raise a cognizable claim under the Lystedt law, Coach Puryear argues that he is entitled to immunity from liability as a volunteer. RCW 4.24.670 makes volunteers immune from liability for simple negligence. However, volunteers are not immune for acts that are grossly negligent or reckless. RCW 4.24.670 provides that:

> (1)   . . . a volunteer of a nonprofit organization or governmental entity shall not be personally liable for harm caused by an act or omission of the volunteer on behalf of the organization or entity if:

17

. . . .

(c) The harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer.

Coach Puryear plainly meets the definition of a "volunteer."[10] Therefore, he is entitled to immunity if his conduct was simply negligent rather than grossly negligent or reckless.

### C. Negligence, Gross Negligence, and Reckless Misconduct

The Swanks presented evidence that Coach Puryear acted with gross negligence or recklessness; the evidence is sufficient to create a genuine issue of material fact.

Whether Coach Puryear acted negligently, grossly negligently, or recklessly requires that we parse the distinction between these three terms. The distinction has been notoriously challenging for courts to trace. *See, e.g., Nist v. Tudor*, 67 Wn.2d 322, 328-29, 407 P.2d 798 (1965) ("[A]lthough the definition of gross negligence as the

---

[10] The Swanks argue that Coach Puryear was not a volunteer. Instead, they claim that he was engaged in a "joint venture" as a controlling party and thus was not acting as an individual. The Swanks bolster their argument that Coach Puryear controlled this "joint venture" by noting that the football program terminated when he withdrew as head coach. Even if true, this argument is unpersuasive. Regardless of whether Coach Puryear operated the football program as a "joint venture," he remains an individual. As the Court of Appeals noted, "The legal capacity in which the individual participates in an endeavor does not change the fact that the individual still is an individual." *Swank*, 194 Wn. App. at 86. Nor does the statute exclude from protection those volunteers in leadership roles, as it specifically protects directors, officers, and trustees. *See* RCW 4.24.670(5)(e). Therefore, the fact that Coach Puryear shared control of the football program with VCS and that the program terminated upon his withdrawal as head coach is not dispositive of his status as a volunteer.

18

failure to exercise slight care has remained constant, its application has not been uniform."). We define "negligence" as

> the act or omission which a person of ordinary prudence would do or fail to do under like circumstances or conditions; it is that degree of care which the reasonably prudent person would exercise in the same or similar circumstances.

*Id.* at 331 (emphasis omitted); *see also Simonetta v. Viad Corp.*, 165 Wn.2d 341, 348, 197 P.3d 127 (2008) ("Under the law of negligence, a defendant's duty is to exercise ordinary care.").

"Gross negligence" is defined, in reference to this baseline, as "negligence substantially and appreciably greater than ordinary negligence." *Nist*, 67 Wn.2d at 331; *see also Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 401, 241 P.3d 1256 (2010) (plurality opinion) (approving of a trial court's finding of gross negligence where "'the degree of neglect . . . was substantially and appreciably greater than ordinary negligence'"). Stated more fully, it is the "failure to exercise slight care, mean[ing] not the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence." *Nist*, 67 Wn.2d at 331; *see also* 6 WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 10.07 (6th ed. 2012) (defining "gross negligence" in the same way).

"'Reckless misconduct differs from negligence in several important particulars.'" *Adkisson v. City of Seattle*, 42 Wn.2d 676, 686, 258 P.2d 461 (1953) (quoting RESTATEMENT OF TORTS § 500 cmt. g (AM. LAW INST. 1934)). To be reckless, "the actor . . . must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent." *Id.* (quoting RESTATEMENT

§ 500 cmt. g). Reckless misconduct, unlike gross negligence, "requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." *Id.* (quoting RESTATEMENT § 500 cmt. g); *see also State v. Graham*, 153 Wn.2d 400, 408, 103 P.3d 1238 (2005) (stating that "'[a] person *is reckless or acts recklessly* when he knows of and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation'" (quoting former RCW 9A.08.010(1)(c) (1975))).

Because each of the three standards turns on a fine-grained factual analysis, "'issues of negligence and proximate cause are generally not susceptible to summary judgment.'" *Owen v. Burlington N. Santa Fe R.R. Co.*, 153 Wn.2d 780, 788, 108 P.3d 1220 (2005) (quoting *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995)).

Here, the Swanks presented evidence about Coach Puryear's conduct that a jury could find to be gross negligence or reckless misconduct. The evidence would support the Swanks' claims that Coach Puryear violated the Lystedt law, as well as their common law negligence claims.

Ample testimony suggests that Coach Puryear failed to monitor Drew for symptoms of a concussion during the game. The assistant coach stated that players who suffered a head injury and were returned to play were not monitored any differently from other players. CP at 75. Coach Puryear similarly stated in his deposition that he was not looking at Drew during the game for the possibility of a concussion. CP at 154.

Substantial evidence contradicts Coach Puryear's statement that he believed Drew's play was normal up until the injury. The Swanks, Drew's aunt, and one of Drew's former teammates all described Drew's conduct during the game as highly unusual and consistent with the "signs" of a concussion in VCS's CIS: "appears dazed; confused about assignment; forgets plays; is unsure of game, score, or opponent; moves clumsily or displays incoordination; any change in typical behavior or personality." These parties characterized Drew as unusually "sluggish," confused, and slow to respond. They recalled Drew missing plays, which was apparently out of character. They further described Coach Puryear and the assistant coach yelling at Drew from the sidelines in apparent frustration over his poor performance. And additional evidence described Coach Puryear grabbing Drew's face mask and shaking it up and down while yelling at Drew.[11]

The Swanks submitted further evidence from an expert, Dr. Stanley Herring, who concluded that Coach Puryear violated the relevant standard of care. Dr. Herring stated that Drew's behavior at the game was "an indication that Drew . . . more likely than not continued to suffer from the concussion he had been previously diagnosed with." He concluded that "the coaching staff should have removed Drew from play once he began

---

[11]The Swanks made a separate claim for damages based on this conduct. They claimed that Coach Puryear caused or contributed to Drew's second impact syndrome when he shook Drew's face mask up and down. The Court of Appeals determined that this "face mask claim" was barred by the two-year statute of limitations for battery. *Swank*, 194 Wn. App. at 86-87. We agree that the face-mask-shaking incident cannot support a claim for damages in and of itself. However, the fact that Coach Puryear shook Drew's face mask need not be walled off from the entirety of Coach Puryear's allegedly reckless or grossly negligent conduct. The trier of fact can evaluate the implications of Coach Puryear's conduct in assessing whether he acted grossly negligently or recklessly. Since the issue of summary judgment pertains to all of Coach Puryear's conduct, we do not separately address the "face mask claim."

to exhibit the signs and symptoms [of a concussion] and kept Drew off the field until he had been properly evaluated and cleared to return to play again."

Viewed in the light most favorable to the Swanks, this collective evidence could suggest that Coach Puryear "substantially" failed to meet the standards of a reasonable and prudent person under the circumstances. *See Nist*, 67 Wn.2d at 328. Taken as a whole, the evidence creates genuine issues of material fact regarding Coach Puryear's degree of fault. A reasonable jury may conclude that Coach Puryear was grossly negligent or reckless when he failed to monitor Drew and remove him from play. As a result, we hold that summary judgment on the claims against Coach Puryear was improper and we reverse.

III.    Personal Jurisdiction over Dr. Burns

We hold that the trial court did not have personal jurisdiction over Dr. Burns and affirm the grant of summary judgment on the claims against him. The trial court did not have personal jurisdiction over Dr. Burns because *Lewis v. Bours*, 119 Wn.2d 667, 835 P.2d 221 (1992), precludes the exercise of personal jurisdiction over Dr. Burns. Dr. Burns provided medical care to Drew solely in Idaho; therefore, the tort is deemed to have taken place in Idaho, not Washington.

A. *Personal Jurisdiction in Washington*

Washington courts' personal jurisdiction is governed by the State's long-arm statute. Washington's long-arm statute reads, in relevant part:

> (1) Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any said acts:

. . . .

(b) The commission of a tortious act within this state.

RCW 4.28.185(1)(b). "Generally, 'when an injury occurs in Washington, it is an inseparable part of the "tortious act" and that act is deemed to have occurred in this state for purposes of the long-arm statute.'" *Lewis*, 119 Wn.2d at 670 (quoting *Grange Ins. Ass'n v. State*, 110 Wn.2d 752, 757, 757 P.2d 933 (1988)). However, we have also recognized an exception to this rule in the case of professional malpractice. *Id.* at 673. In *Lewis*, this court held that "[i]n the event that a nonresident professional commits malpractice in another state against a Washington State resident, that, standing alone, does not constitute a tortious act committed in this state regardless of whether the Washington State resident suffered injury upon his or her return to Washington." *Id.*

*B. The Medical Care Was Provided in Idaho*

Here, all of the relevant medical care that Dr. Burns provided to Drew took place in Idaho, even though Dr. Burns released Drew to play football in Washington, for a Washington school, and pursuant to Washington law. We have emphasized that provision of medical care, as a personal service, is strongly tied to the location where those services are performed. In *Grange Insurance*, an Idaho veterinarian examined cattle in Idaho and signed certificates of health in Idaho, which indicated that the cattle were healthy and that the cattle were to be sent to an address of a Washington buyer. 110 Wn.2d at 755. The inspected cattle were sent to Washington; they became sick and infected some neighbors' cattle. *Id.* at 754. This court declined to exercise personal jurisdiction over the Idaho veterinarian, reasoning that "the rendition of services is more

23

personal in nature than is the sale of goods, such that the location where the services are performed is of greater jurisdictional importance than is the location where a product is bought." *Id.* at 763.

In *Grange Insurance*, we further described a policy basis for refusing to find jurisdiction for services performed out-of-state: the goal of "ensuring that medical services are fully available to all people . . . might be inhibited if doctors were worried about having to defend malpractice suits in distant states." *Id.* This public policy is also the basis for the rule,[12] established in *Lewis*, that a tort does not take place in Washington when a medical provider gives allegedly deficient care in a different state. *See Lewis*, 119 Wn.2d at 674 (holding that "in the case of professional malpractice, a tort is not committed in Washington if the alleged act of malpractice was committed out of state even though the injuries may manifest themselves in Washington"). In *Lewis*, a Washington resident mother gave birth at a clinic in Oregon. *Id.* at 668. The doctor released the mother and baby to return home to Washington without instructing that the baby was "'at high risk for neonatal distress.'" *Id.* On the way home, and in Washington State, the baby suffered severe injuries. *Id.* at 669. The mother sued the Oregon doctor, claiming that the doctor had committed a tort in Washington because

---

[12] This rule is also the majority rule. *See, e.g., Harlow v. Children's Hosp.*, 432 F.3d 50, 63-66, 69 (1st Cir. 2005) ("The question is not whether hospitals may be held responsible in lawsuits for their activities, but whether they may be haled into court out of state because they accept out-of-state patients. It would be unreasonable to conclude that they could."); *Zavala v. El Paso County Hosp. Dist.*, 2007-NMCA-149, 143 N.M. 36, 172 P.3d 173, 181-83 (declining to exercise personal jurisdiction over a Texas hospital and physician who accepted patients from New Mexico); *Vance v. Molina*, 2001 OK 60, 28 P.3d 570, 573-74 (concluding that "requiring a nonresident physician to defend a lawsuit in a forum to which the doctor's only connection is followup care rendered to a patient who came to the doctor in the doctor's home state for primary treatment would be unfair" and declining to exercise personal jurisdiction).

the injuries manifested themselves in Washington. *Id.* The court declined to exercise personal jurisdiction over the doctor and created "an exception to the general rule that the place of the tort is the place where the injury occurs." *Id.* at 673. Instead, claims for medical malpractice originating from care provided in another state but the injury manifests itself in Washington do not constitute a tortious act giving rise to the exercise of personal jurisdiction in Washington. *Id.*

The Swanks do not ask the court to overrule *Lewis*. Instead, they attempt to distinguish it, arguing that because Dr. Burns released Drew to play football in Washington, for a Washington school, and pursuant to Washington law, the language in *Lewis* does not apply. We reject these arguments because all the relevant medical care provided by Dr. Burns was in Idaho.

Since Dr. Burns provided medical care solely in Idaho, Washington cannot exercise personal jurisdiction. All relevant actions that Dr. Burns took occurred in Idaho: Dr. Burns examined Drew in Idaho, he wrote and signed the note releasing Drew to play football in Idaho, and he left that note in the Idaho office to be picked up by Drew's mother. Even though Drew's injuries manifested in Washington, like the injuries in *Grange Insurance* and in *Lewis*, personal jurisdiction is improper because the relevant medical care Dr. Burns provided was rendered in Idaho and the tort is considered to have taken place there.[13] As a result, we hold that the trial court did not have personal jurisdiction over Dr. Burns and affirm the trial court's grant of summary judgment.

---

[13] We also note that the Swanks, Idaho residents, are suing Dr. Burns, also an Idaho resident. This court has declined to exercise personal jurisdiction in cases where Washington residents

## CONCLUSION

In conclusion, we reverse in part and affirm in part. First, we hold that the Lystedt law includes an implied cause of action because (1) the plaintiff is a member of the protected class, (2) the legislature intended to provide recovery for statutory violations, and (3) the legislative purpose is consistent with finding an implied cause of action. Thus, we reverse summary judgment on this point, and the Swanks' claims that VCS and Coach Puryear violated the Lystedt law are reinstated and are remanded for further proceedings consistent with this decision. Second, we reverse the grant of summary judgment on the claims against Coach Puryear, as there remain material issues of fact about whether his actions were grossly negligent or reckless. As a result, we reinstate the Swanks' common law negligence claims against the coach. Finally, we affirm the grant of summary judgment for the claims against Dr. Burns because the trial court lacked personal jurisdiction over him. We remand for further proceedings consistent with this opinion.

---

sued out-of-state defendants in similar circumstances. *See, e.g., Lewis*, 119 Wn.2d 667; *Grange Ins.*, 110 Wn.2d 752.

_____Wiggins, J._____

WE CONCUR.

_____Fairhurst, C.J._____     _____Stephens, J._____

_____Johnson, J._____     _____González, J._____

_____Madsen, J._____     _____Gordon McCloud, J._____

_____Owens, J._____     _____Yu, J._____

27